**In the Matter of S.L.N. and D.N.N.**

No. 22662.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 21, 2000.

Richard D. Bender, Springfield, for appellant.

Roya R. Hough, Jefferson City, for respondent Dept. of Soc. Srvs.

Scott R. Pettit, Aurora, for respondents Adoptive Parents of Aurora.

ROBERT S. BARNEY, Judge.

G.E. ("Mother") appeals from a judgment of the Circuit Court of Lawrence County, Juvenile Division, ("juvenile court") terminating her parental rights to two daughters, S.L.N. (born 5/22/91) and D.N.N. (born 2/20/93).

On August 14, 1993, pursuant to a "hotline call," John Wolf, deputy juvenile officer for the 39th Judicial Circuit, took S.L.N. and D.N.N. into protective custody, due to household conditions that Mr. Wolf testified were some of the worst he had seen in his nine years of experience. At that point in time there was very little food in the home and the home was filthy. Mr. Wolf further testified that diapers containing feces and maggots were found lying in the front yard. Pictures taken by Mr. Wolf at the time show a mobile home with dirt, trash, food, clothes, and toys liberally strewn about the yard and house. The pictures also show an apparently inoperative toilet filled with feces as well as a refrigerator on the front porch containing a collage of food, filth and grime.

The children were placed with foster parents, with whom the children have been ever since. The Division of Family Services ("DFS"), specifically case worker Vanessa Johnson, worked with Mother for almost five years in an effort to help her with mental problems, her alcohol addiction, and parenting skills, discussed below. Mother had another child, B., in February

of 1996. Mother married D.E., B.'s father, on May 31, 1997. On April 9, 1998, the foster parents filed a petition seeking termination of Mother's parental rights and adoption of S.L.N. and D.N.N.

Petitioners sought termination under section 211.447, RSMo Cum.Supp.1997, which directs that upon the petition of the juvenile officer or, in adoption cases, a prospective parent, the juvenile court may terminate a parent's rights if it "finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the ... grounds for termination exist ...." § 211.447.2;[1] *see also In the Matter of B.S.R.*, 965 S.W.2d 444, 448 n. 2 (Mo.App.1998)(under section 453.040(1) a formal termination of parental rights pursuant to section 211.447 would be a basis for a grant of adoption without the consent of a natural parent).

The court based its judgment on the grounds contained in subdivisions (2) and (3) of section 211.447.2. "Strict and literal compliance with the statutory requirements, relating to termination of parental rights, is necessary."[2] *In the Interest of F.M.*, 979 S.W.2d 944, 946 (Mo.App. 1998); *see In the Interest of H.R.R.*, 945 S.W.2d 85, 87 (Mo.App.1997).

"On review, we will affirm the circuit court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *In the Interest of F.M.*, 979 S.W.2d 944, 946 (Mo.App.1998). "We review the facts and all reasonable inferences in the light most favorable to the circuit court's judgment, and will reverse only if we are left with a firm impression that the judgment is wrong." *In the Interest of F.M.*, 979

S.W.2d at 946. "The trial court determines the witnesses' credibility." *In the Interest of M.S.*, 830 S.W.2d 540, 543 (Mo. App.1992).

"Evidence is clear, cogent and convincing when it instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re A.M.C.*, 983 S.W.2d 635, 637 (Mo.App. 1999). However, " '[c]lear, cogent and convincing evidence' does not imply the absence of conflicting evidence." *In the Interest of M.S.*, 830 S.W.2d at 543. " 'When the trial court has received conflicting evidence, appellate courts should review the facts in a light most favorable to the trial court's order.' " *Id.*(quoting *In the Interest of M.E.W.*, 729 S.W.2d 194, 196 (Mo. banc 1987)). While "[t]he primary concern in any termination case is the best interests of the children," *In re A.M.C.*, 983 S.W.2d at 637, "[t]he court may reach the issue of the best interests of the children ... only after it has made a determination that one or more of the statutory grounds for termination exists." *Id.*

Mother's sole point on appeal reads as follows:

[t]he [juvenile] court erred in entering judgment terminating [Mother's] parental rights because the judgment is not supported by the pleadings or the evidence in that the judgment is based in part on matters not raised by the pleadings and in part on evidence insufficient to support the action of the court.

We observe, initially, that Mother's brief fails to comply with Rule 84.04.[3] Rule 84.04(d)(1) reads, in pertinent part, as follows:

These factors were properly considered by the juvenile court and are discussed in detail *infra*.

---

1. All statutory references are to RSMo Cum. Supp.1997.

2. Section 211.447.3 mandates that if the termination is based on subdivisions (1) through (5) of section 211.447.2, the court is also required to consider seven further factors.

3. All rule references are to Missouri Court Rules (1999), unless otherwise noted.

(1) Where the appellate court reviews the decision of a trial court, each point shall:

(A) identify the trial court ruling or action that the appellant challenges;

(B) state concisely the legal reasons for the appellant's claim of reversible error; and

(C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.

The point shall be in substantially the following form: "The trial court erred in [*identify the challenged ruling or action* ], because [*state the legal reasons for the claim of reversible error* ], in that [*explain why the legal reasons, in the context of the case, support the claim of reversible error* ]."

Rule 84.04(d)(1). Further, under Rule 84.04(d)(4), we find that, "[a]bstract statements of law, standing alone, do not comply with this rule. Any reference to the record shall be limited to the ultimate facts necessary to inform the appellate court and the other parties of the issues." Rule 84.04(d)(4). Mother's point relied on is an abstract statement of law that fails to "explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error." Rule 84.04(d)(1)(C). Further still, Rule 84.04(i) directs that "[a]ll statements of fact and argument shall have specific page references to the legal file or the transcript." Rule 84.04(i). The argument portion of Mother's brief contains numerous unreferenced statements of fact and argument, requiring us to seine the record in order to determine their accuracy. Finally, "[m]ultiple contentions not related to a single issue may not be grouped together in a single point relied on." *In the Interest of A.H.*, 963 S.W.2d 374, 379 (Mo.App.1998). As examined more fully *infra*, Mother's point has two distinct contentions related to each other only in the sense that they are claims of error concerning the judgment of the juvenile court. Nevertheless,

as previously stated, "in cases involving custody of a child the most important issue is the best interest of the child." *In the Interest of F.M.*, 979 S.W.2d at 947. "Accordingly, we have reviewed *ex gratia* the entire record of the termination hearing...." *Id.*; *see* Rule 84.13(c).

Mother's point relied on posits two bases for error in the juvenile court's judgment, to-wit: that the judgment is based "in part on matters not raised by the pleadings" and that the judgment is based "in part on evidence insufficient to support the action of the court." We discuss first Mother's claim that the judgment was based on matters not raised by the pleadings.

Petitioners' petition initially listed three factors supporting termination: (a) abandonment under section 211.447.2(1); (b) "[t]hat there [was] no reasonable likelihood that a reconciliation between the natural mother and the said minor children [could] be accomplished within a reasonable amount of time"; and (c) "[t]hat the natural father of said minor children ... [had] given his consent to ... the termination of his parental rights." However, on the first day of the termination hearing, the petition was amended to add the following:

The children have been under the jurisdiction of the juvenile court for a period of more than one year, and the conditions which lead to the assumption of court jurisdiction still persist, or conditions of potentially harmful nature continue to exist so that there is little likelihood that those conditions will be remedied at an early date so that the children can be returned to the parents in the near future, or the continuance of the parent-child relationship greatly diminishes the children's prospects for early integration back to their mother's home. Based on the following:

a) [Mother] has failed to comply with the Social Services plan;

b) [Mother] has a mental condition which is either permanent or there is no reasonable likelihood that the con-

dition can be reversed and renders said parent unable to provide the children with the necessary care, custody and control;

c) [Mother] has a chemical dependancy (sic) which prevents her from consistently providing the necessary care, custody, and control over the children; and she cannot be treated to enable her to consistently provide such care, custody and control.[4]

Mother claims that the petition, as amended, only raises subdivisions (1) and (3) of section 211.447.2 as grounds for termination and that, therefore, it was error for the juvenile court to consider "neglect" under subdivision (2) of section 211.447.2, as shown by the juvenile court's termination judgment, discussed *infra*. Petitioners allege, however, in their brief on appeal that evidence was presented, without objection, on the issue of neglect and, therefore, the petition was automatically amended to conform to the evidence.

■ While it is true that due process requires that termination occur only on a ground asserted in the petition, *see In the Interest of H.R.R.*, 945 S.W.2d at 88, the "[f]ailure to object to evidence offered beyond the scope of the pleadings results in automatic amendment of the pleadings to conform to the evidence and is a consent to try the applicable issues." *Riley v. Riley*, 778 S.W.2d 666, 669 (Mo.App.1989); *see* Rule 55.33(b)("[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings"); *In the Interest of M.H.*, 828 S.W.2d 951, 954 (Mo.App. 1992). However, "[t]he implied consent rule applies only where the evidence presented bears solely upon the unpleaded issue and not upon issues already in the case." *Edna Enters., Inc. v. Spirco Envtl., Inc.*, 853 S.W.2d 388, 392 (Mo.App. 1993).

■ Our review of the record reveals that evidence was offered and admitted without objection as to the "neglect" of the children, particularly as to those elements contained in paragraph (d) of section 211.447.2(2), i.e., "[r]epeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development; ..." This specific statutory ground for termination is outside the statutory scope of either subdivision (1)(abandonment for a period of six months or more) or subdivision (3)(failure to rectify) of section 211.447.2. Therefore, the court properly considered subdivision (2) of section 211.447.2 when making its decision as to termination.[5]

■ We now turn to Mother's second claim: i.e., that the evidence presented was insufficient to support the juvenile court's judgment. The juvenile court specifically found that termination was in the best interests of the children. It found the existence of two grounds: neglect (§ 211.447.2(2)) and failure to rectify (§ 211.447.2(3)).[6] The court also evaluated

---

4. Mother's answer to the petition was likewise amended to deny the new allegations.

5. "Neglect" has been described in the context of a termination of parental rights proceeding as "a general and a negative proposition meaning simply the failure to perform the duty with which a parent is charged by the law and by conscience." *S.K.L. v. Smith*, 480 S.W.2d 119, 124 (Mo.App.1972). In the context of adoption proceedings, it has been stated that "neglect is a question of an intent to forego parental duties, 'which generally is an inferred fact, determined by conduct within the statutory period, combined with relevant conduct both before and after the period.'" *In the Matter of B.S.R.*, 965 S.W.2d at 449(quoting *C.B.L. v. K.E.L.*, 937 S.W.2d 734, 737 (Mo.App.1996)). "'That is, the greatest weight is given to conduct within the statutory period, and the least weight is given to conduct after the petition for adoption was filed.'" *Id.*(quoting *In re Marriage of A.S.A.*, 931 S.W.2d 218, 222 (Mo.App.1996)).

6. The juvenile court found that no evidence was presented as to subdivision (1) of section 211.447.2. (Abandonment).

and made findings on those factors set out in section 211.447.3. We shall only discuss its findings as to subdivision (2) of section 211.447.2 and the subdivisions of section 211.447.3 since "[t]he existence of even one statutory ground for termination is sufficient if termination is in the child's best interests." *In the Matter of M.M.*, 973 S.W.2d 165, 168 (Mo.App.1998); *see M.C. v. D.C.*, 762 S.W.2d 476, 478 (Mo.App. 1988). We now turn to the analysis of section 211.447.2(2) vis-à-vis the evidence elicited in this case.

### § 211.447.2(2)

This subdivision has four paragraphs of "conditions or acts of the parent"—listed below—that must be considered in determining whether the child has been "abused or neglected." We review these paragraphs out of order for the sake of clarity.

### § 211.447.2(2)(d)

Paragraph (d) reads as follows:

(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development; . . .

The juvenile court found that Mother had "repeatedly and in some instances continuously failed to provide the children with adequate food, clothing, shelter or education or other care and control necessary for the children's physical, mental or emotional health and development." The foster mother, when asked about the consistency of Mother's visits stated that the consistency dropped off quite a bit in 1994, that "then there would be weeks at a time that she wouldn't show up or call, and then there would be months, after, you know, later on it'd be months. And — And it was just none. And sometimes she might come with two or three times in a row and then skip several times. . . ." The foster mother further testified that Mother had failed to send the children any cards or letters or call them on the telephone. Mother failed also to consistently pay child support until August of 1997 when wage assignments were imposed, even though she either was employed or was capable of employment for most of the time since the children went into foster care. We believe the record supports the juvenile court's findings per section 211.447.2(2)(d). Clearly the children were not being provided with adequate food, clothing and shelter at the time they were originally taken into the jurisdiction of the State and placed in foster care. For several years after the children were placed in foster care Mother repeatedly missed visits; had moved, according to her own testimony at trial, ten times; had by her own admission struggled with substance abuse problems and thoughts of suicide; and had failed to make support payments. The foster mother testified that Mother gave the children gifts on their birthdays and for Christmas two out of the five years the children had been in foster care prior to the hearing. DFS records show that even in 1997 and early 1998 the children reported mice and roaches in Mother's home and that the children were at times sleeping on the floor. The records reflect that the case worker saw two mice during a home visit in 1997, "one on the counter and one running across the sink and over the clean dishes," and that one of the girls returned from a visit with mother wearing a sock that had been partially eaten by mice. Finally, the foster mother testified, and the records of Ms. Johnson reflect, that on a number of more recent occasions the children would return from their visits with Mother dirty and hungry, and that on two occasions S.L.N. returned from visits with Mother with head lice.

The progress that Mother made from the date the children were removed from her home, April 14, 1993, to the date of the termination hearing, June 1, 1998, should not go unrecognized. It is true, as posited by Mother, that many of the conditions

that prompted the DFS to remove the children from her home were either ameliorated or no longer present at the time of the termination hearing. Mother's new husband, and the couple's family members seem to provide a much stronger support system than Mother has previously had and seem to evince a willingness to contribute to the running of the household. No evidence was presented that she was unable to properly parent her youngest child, who remained under her care. However, we also observe the testimony of Doctor Kukal, noted *supra*, in which she stated "with a very strong degree of psychological certainty, that whatever kind of parent [Mother] has demonstrated herself to be in the past, she still is."

Additionally, "[a]ll grounds for termination must to some extent look to past conduct," *In the Interest of J.M.L.*, 917 S.W.2d 193, 196 (Mo.App.1996), because the past provides vital clues to present and future conduct. "Otherwise, a parent can always argue that she has reformed since the filing of the petition, reformation usually occurring while the child is away." *Id.* Furthermore, it is difficult to overlook the fact that for several years Mother appeared to demonstrate a lack of commitment to her children, thereby requiring their continuation in foster care placement and the active intervention of the DFS in their affairs. "If a parent fails to act in the best interests of a child ... that responsibility shifts to DFS because protecting the child's well-being and future development takes priority over family unity." *In the Interest of B.A.*, 931 S.W.2d 926, 930 (Mo.App.1996).[7]

■■■ "It is [also] appropriate for a trial court to consider the length of time a child is out of a parent's custody and the limited

contact during that time." *Id.* Reviewing the facts and all reasonable inferences in the light most favorable to the juvenile court's judgment, as we must, we conclude that there was sufficient evidence supporting the juvenile court's determination that the children had been neglected by their mother, warranting termination under the provisions of section 211.447.2(2)(neglect).

## § 211.447.2(2)(c)

Paragraph (c) relates to severe or recurrent acts of physical, emotional or sexual abuse toward the child on the part of a parent. The juvenile court found that no evidence had been presented as to this paragraph.

## § 211.447.2(2)(a)

Paragraph (a) reads, as follows:

(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control.

The juvenile court found that Mother suffered from a mental condition which rendered her unable to knowingly provide S.L.N. and D.N.N. with the "necessary care, custody and control." The record shows that on the recommendation of Ms. Woodsmith, Mother's longtime therapist, Mother was referred to and admitted to Bellwood Health Center in California on September 7, 1994. A psychological evaluation performed there contains a diagnosis of "major depression with melancholia," "anxiety disorder, not otherwise specified," and "mixed substance abuse, alcohol and marijuana." The record also shows that

---

7. Indeed, Ms. Johnson testified that in December of 1996, DFS had decided to switch their case plan emphasis from reunification of the family to adoption for the children. Ms. Johnson further testified that "[Mother] had very strong feelings against that case plan. Therefore, we put together a visitation plan to see and to give [Mother] an opportunity to see

if she could manage the care of three children, and, therefore, we increased the visits dramatically ... we wanted to give her a chance." However, Ms. Johnson testified that the increased visitation only lasted until March or April of 1997 because "[Mother's] emotional state was very rocky. She was not handling the stress well."

Mother had "suicidal ideation" at the time of her stay at Bellwood and that Mother reported that she had attempted suicide when she was thirteen. In further support of its conclusion, the juvenile court referenced the progress report of Ms. Woodsmith, prepared in March of 1998, which indicated that Mother had problems with nurturing. Ms. Woodsmith testified that at times Mother has "bipolar" symptoms, that Mother had told her "that [Mother] had been diagnosed as being bipolar early on," and that at times Mother had been clinically depressed. Ms. Woodsmith testified that Mother's stress level increased significantly when she had visits with the children and that this caused problems with Mother's anger and behavior. However, Ms. Woodsmith also testified that this pattern did not continue after Mother remarried and that Ms. Woodsmith was not aware of any mental condition which rendered Mother unable to provide S.L.N. and D.N.N. with the necessary care, custody and control, a conclusion contradicted by other evidence presented to the juvenile court.

The juvenile court found that Mother "continues to struggle in the area of anger management," a finding supported by Ms. Woodsmith's progress reports concerning Mother for January 1998, and March 1998, which both note that Ms. Woodsmith was working with Mother on resolving her "anger." Further, Dr. Kukal, after a psychological evaluation of mother, reported on March 7, 1997, that Mother had a "personality that is unlikely to change," testimony consistent with the fact that Mother had failed to follow case plans established by DFS, especially as to obtaining treatment for alcoholism.

While Dr. Kukal's psychological evaluation of Mother, performed March 7, 1997, revealed no specific disorder nor a "severe antisocial personality," the evaluation, in pertinent part, revealed the following:

[Mother's] legal problems,[8] her denial of personal responsibility and attempts to blame others, her lying and the history of substance abuse, the inappropriate lack of internal stress, depression or anxiety apparent [in] her testing, and her demonstrated lack of empathy, are all indicative of a personality disorder, which would probably best be described as Antisocial Personality Disorder.

A personality disorder encompasses the foundational internal structure of the individual, and is not amenable to change. In fact, [Mother] has demonstrated little change and little attempt to change. The issues which lead to the initial problems with parenting, including lack of empathy and disregard for basic needs, are still in place; no change in her approach to difficult realities or personal responsibility is in evidence.

Individuals with this disorder do not typically respond to treatment. It is likely that [Mother] will continue to use and/or abuse substances, and [it] is even more likely that she will continue to demonstrate a lack of awareness of and lack of regard for the emotional realities of others, including the children in her care.

■ Further, Dr. Kukal testified as follows:

I will say, with a very strong degree of psychological certainty, that whatever kind of parent [Mother] has demonstrated herself to be in the past, she still is. Now, whether she was a competent parent in the past, I don't have enough evidence that I can say that with any certainty.

But I can say with certainty that she's no different now—there is no evidence that she is any different now than she was then.... Who she's always been is who she is. And if that was not an

8. The records showed that Mother wrote a number of bad checks in a number of different counties in 1994.

adequate parent, then that's probably what you still have.

From the above, we find that that was adequate evidence presented from which the juvenile court could have found that Mother suffered from a mental condition which rendered her unable to knowingly provide S.L.N. and D.N.N. with the requisite and necessary care, custody and control, as outlined by the subdivision under discussion.

### § 211.447.2(2)(b)

Paragraph (b) reads as follows:

(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control; . . .

The juvenile court likewise found that Mother suffered from a chemical dependency which prevented her "from **consistently** . . . providing the necessary care, custody and control of the children and which cannot be treated as to enable the parent to consistently provide such care, custody and control." In support of this determination, the juvenile court found, and the record so supports, that S.L.N. and D.N.N. "came into foster care at a time when [Mother] was experiencing substance abuse"; that Mother had been diagnosed as being chemically dependent by Bellwood Hospital in California and three mental health professionals; that Dr. Kukal found that Mother still had an addictive disorder; that Mother's caseworker smelled alcohol on Mother while visiting with her and observed alcohol throughout Mother's home during a home visit. Further, Mother testified that she had refused for months to seek the treatment for her alcoholism required by her case plan in that she thought it was a "waste of time and waste of money." Therefore, the juvenile court found that section 211.447.2(2)(b) favored termination.

Mother testified she had used alcohol and other drugs to "self-medicate" her depression and would consider herself an alcoholic. However, she also maintained that she had abstained from using alcohol since B.'s birth. The juvenile court did not have to believe this testimony. *In the Interest of M.S.*, 830 S.W.2d at 543("[t]he trial court determines the witnesses' credibility"). As noted above, Mother's alcoholism has been well documented, and the evaluation of Dr. Kukal revealed that psychological testing of Mother suggested "a likelihood that she is currently abusing or over-using addicting substances." Further, Mother has a history of resisting treatment for her alcoholism. Jim Dorris, who evaluated Mother for alcoholism in 1994 testified in his deposition that alcoholism is a disease that doesn't go away. While Mother's alcoholism alone might not prevent her from consistently providing the children the necessary care, custody and control, we cannot say the juvenile court erred in it findings relative to paragraph (b) of section 211.447.2(2).

### § 211.447.3

Since the juvenile court terminated Mother's parental rights pursuant, *inter alia*, to subdivision (2) of section 211.447.2, it was also required to "evaluate and make findings" as to the seven factors delineated in subdivisions (1) through (7), of subsection 3, of section 211.447. "The statute leaves it to the trial court's discretion to make findings on the factors it deems applicable to [this] case." *In the Interest of M.H.*, 859 S.W.2d 888, 897 (Mo. App.1993). "Our review is limited to an abuse of that discretion." *Id.* We find no abuse of juvenile court discretion in its findings and conclusions relating to the following factors as set out. We now turn to a discussion of these statutory factors under section 211.447.3.

### § 211.447.3(1)

(The emotional ties to the birth parent.)

The juvenile court specifically found that "[t]he children's emotional ties to

[Mother] are weaker than those to the foster parents. It has been the foster parents who have provided the emotional stability for these children and to whom the children look as parents." There was substantial evidence before the juvenile court that the children's emotional ties to Mother were weak. Ms. Johnson testified that D.N.N., who began living with the foster parents when she was five months old, refused to acknowledge that Mother was her birth mother. Further, Ms. Johnson testified that S.L.N. understood that Mother was her birth mother but looked to her foster mother for care and support. Dr. Joyce Noble performed psychological evaluations of both the children during the summer of 1996. Dr. Noble's reports on those evaluations, dated September 30, 1996, reflect that the reason the evaluations were being performed was that "termination of parental rights [was] being considered." Dr. Noble reported at that time that "for [D.S.S.] to be moved from the [foster parent's] home in which she has spent the vast majority of her life would be a major loss, comparable to the simultaneous death of both parents and most of her siblings." Dr. Noble testified at the termination hearing that both children had some level of attachment to Mother but that neither saw her as very able to meet their needs and that the attachment that they did have to her was far outweighed by their strong relationship with the foster mother. The record is clear that, as one would expect, after spending the majority of their lives with the foster parents, the children's emotional ties to Mother are weak.

### § 211.447.3(2)

#### (Regular visitation by parent.)

■ The juvenile court found that "[d]uring crucial formative years, Mother's visitation and other contact has been sporadic and inconsistent." As discussed *supra*, there was evidence presented that Mother's visitation had been extremely sporadic during at least the first three years, though the visitation had been more regular during the later periods, including overnight visits. *See In the Interest of T.T.*, 954 S.W.2d 429, 432–33 (Mo.App. 1997); *In the Interest of S.H.*, 915 S.W.2d 399, 404 (Mo.App.1996)("A short term improvement in circumstances which occurs after the filing of the petition for termination is less apt to be persuasive").

### § 211.447.3(3)

#### (Cost of care and maintenance of the child.)

■ As noted *supra*, Ms. Johnson testified that Mother started regularly paying support for the children only after they had been in protective care for four years. Even then, there was evidence presented in the record that Mother's payment was involuntary in that it was by wage assignment. *See In the Interest of M.J.A.*, 826 S.W.2d 890, 899–900 (Mo.App.1992).

### § 211.447.3(4)

#### (Additional services.)

■ The juvenile court found that due to the fact that the children had lived for such a large portion of their short lives with the foster parents, it would be unwise to return the children to Mother within an ascertainable period of time in that "[t]he period of adjustment, if ever successful, would extend into adolescence." There was testimony presented from Ms. Johnson and Mrs. Koehler that the trauma of the increased visitation at or near the time of the termination proceedings was causing behavior problems and aggression in S.L.N., and caused significant distress in both children. Marilyn Wachner, a psychologist that met with the children eleven times between October, 1997, and May 19, 1998, opined in a letter to Ms. Johnson that "[S.L.N. and D.N.N.] will have difficulty with trust issues, relationship difficulties and will regress developmentally if they are taken away from their foster parents. They have thrived with the love,

care and stability given them by their foster parents."

## § 211.447.3(5)

### (Disinterest in/lack of commitment to the child.)

█ The juvenile court found:

Mother has demonstrated her disinterest in or lack of commitment to the children by her failure to support them, failure to abide by the terms of service agreements and a general failure to appreciate the seriousness of these proceedings until the children have long since looked elsewhere for their emotional support.

While it is clear that Mother is now very interested in not having her parental rights terminated, many of her actions or lack of action over the years since the children were placed in foster care have demonstrated a disinterest in or a lack of commitment to the children themselves. As previously set out, the repeated missed visitations during the early years of separation evidence this disinterest. Also compelling is the testimony of the foster mother relating that the adoption of the children by her and her husband was originally Mother's idea. The foster mother testified that approximately two years prior to the termination hearing, Mother approached her and her husband to see if they would have any interest in adopting the children and that, at that time, they had not thought about it and did not want to. She further testified that one of the main reasons that they did not want to adopt the children at that time was that the biological father was still involved in the process.[9] So, evidently, at least at one point during her separation from the children, Mother's disinterest and lack of commitment was such that she was seeking to have her own parental rights terminated.

## § 211.447.3(6) & (7)

### (Felony conviction; deliberate acts creating risk of physical/mental harm)

Generally, subdivision (6) concerns the conviction of a parent for a felony offense and subdivision (7) concerns actions for deliberate acts of the parent or another "of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm." The juvenile court found that no evidence had been presented concerning either of these subdivisions.

### Conclusion.

While Mother has admittedly made progress in her life since the children were initially removed from her home, we cannot find that the juvenile court erred in finding that adequate grounds for termination were proven by clear, cogent and convincing evidence. While there was conflicting evidence presented, we reiterate that "[t]he trial court determines the witnesses' credibility," *In the Interest of M.S.*, 830 S.W.2d at 543; additionally, "[w]e review the facts and all reasonable inferences in the light most favorable to the circuit court's judgment, and will reverse only if we are left with a firm impression that the judgment is wrong." *In the Interest of F.M.*, 979 S.W.2d at 946. "In reviewing the evidence it is clear the best interests of these children will be served through termination and integration into a stable and permanent home." *D.D.C. by Juvenile Officer v. B.C.*, 817 S.W.2d 940, 944 (Mo.App.1991).

The judgment of the juvenile court is affirmed.

MONTGOMERY, P.J., concurs.

GARRISON, C.J., concurs.

---

9. The biological father's parental rights were voluntarily terminated.