In the Interest of J.M.S., Plaintiff,

**JUVENILE OFFICER, Respondent,**

v.

**A.S. (Father), Appellant,**

**B.I.S. (Mother), Defendant.**

No. WD 60968.

Missouri Court of Appeals,
Western District.

Aug. 27, 2002.

John A. Lozano, Harrisonville, MO, for appellant.

Cathelene L. Winger, Harrisonville, MO, for respondent.

James E. Hoke, Harrisonville, MO, for plaintiff.

J. Denise Carter, Kansas City, MO, for defendant.

Before BRECKENRIDGE, P.J., HOWARD and HOLLIGER, JJ.

PATRICIA BRECKENRIDGE, Judge.

A.S. (Father) appeals the termination of his parental rights to his son, J.M.S. On appeal, A.S. claims that there was not clear, cogent and convincing evidence to terminate his parental rights on the basis of abandonment under § 211.447.4(1)(b),

RSMo 2000.[1] Father also claims that the trial court erred in terminating his parental rights on the basis of abuse and neglect, under § 211.447.4(2), because the juvenile officer did not plead this as a basis for termination in its petition. Because this court finds that there was not clear, cogent, and convincing evidence to support termination of Father's parental rights on the basis of abandonment, and termination on the basis of abuse and neglect violated Father's right to due process of law because the juvenile officer failed to plead abuse and neglect as a basis for terminating Father's parental rights, the judgment of the trial court is reversed.

### Factual and Procedural Background

Father and J.M.S.'s mother, B.I.S., were married on February 17, 1996. At the time they married, Mother had two other children, T.C.P., who was born on February 28, 1993, and M.D.P., who was born on February 21, 1994, from two prior relationships. J.M.S. was born on May 22, 1997. All three children lived with Father and Mother.

Mother and Father had a turbulent relationship. Mother occasionally took J.M.S. and his half-siblings and stayed with her parents for a week or so at a time before returning to live with Father. In March 1998, Father told Mother that since they could not get along, he was leaving her to pay all of their bills while he got a place of his own. Father moved out of the family's apartment and moved into a duplex. Father lived in the duplex by himself for a month before Mother and the children moved in with him.

A year later, in March 1999, Father was arrested for possession of cocaine. Father admitted that he had been using cocaine for six to eight months before his arrest. At the time of his arrest, Father was on probation for second degree assault for abusing Mother. Father's probation on the assault charge was revoked and he was subsequently convicted of selling and possessing cocaine. Father was incarcerated in the Jackson County Jail for 120 days beginning April 16, 1999. In August 1999, he was transferred to the Algoa Correctional Center to serve his sentence.

After Father was incarcerated, J.M.S. continued to live with Mother. On December 9, 1999, DFS took J.M.S. and his half-siblings into protective custody. Eight days later, the children were released from protective custody and placed back with Mother. On February 3, 2000, all three children were taken into protective custody again. On that day, the juvenile officer filed a petition for adjudication and disposition.[2] The petition alleged that Father was incarcerated. It further alleged that J.M.S. was in need of care and treatment because (1) on December 7, 1999, Mother left the home at 11:00 P.M., telling the children's babysitter that she would be gone for only thirty minutes, but did not return until approximately fifteen hours later; (2) Mother repeatedly left J.M.S.'s half-siblings without proper care by locking them out of the house several times and by not being at the house when they return home from school; (3) one of J.M.S.'s half-siblings suffered from poor hygiene which might be health threatening; (4) Mother failed to cooperate with DFS and the intensive in-home services program, and she did not comply with the terms of her protective service agreement; and (5) Mother slept for hours at a time,

---

1. All statutory references are to the Revised Statutes of Missouri 2000.

2. This court will discuss only the petition pertaining to J.M.S., since this appeal does not concern J.M.S.'s half-siblings.

leaving J.M.S. and his half-siblings unsupervised.

After J.M.S. was taken into protective custody, the first contact DFS had with Father was initiated by Father when he called, from prison, Ann Mitchell, the DFS social worker assigned to the case. Father called sometime in February or March 2000, prior to the hearing on the juvenile officer's petition. Father told Ms. Mitchell that he was aware J.M.S. had been taken into protective custody. Father and Ms. Mitchell discussed J.M.S.'s being in protective custody and DFS's plan to request that J.M.S. be placed with his maternal grandparents. Father did not indicate to Ms. Mitchell that he was unhappy with that placement.

On March 14, 2000, the court held a hearing on the juvenile officer's petition for adjudication and disposition. After finding the allegations in the petition to be true, the court took jurisdiction over J.M.S. and ordered custody of J.M.S. to DFS. DFS placed J.M.S. and his half-siblings with J.M.S.'s maternal grandparents.

Meanwhile, Father remained in prison until his release in June 2001. Father could have had visitation with J.M.S. during his incarceration, but Father did not request any visits because he did not want J.M.S. to have to come to the prison. Although Father did not request visits with J.M.S., he regularly sent letters to J.M.S. throughout his incarceration in Algoa. While J.M.S. was living with Mother, Father sent letters to Mother to read to J.M.S. After the court took jurisdiction over J.M.S. and transferred custody to DFS, Father sent at least one letter every two weeks to DFS to forward to J.M.S.'s

maternal grandparents.[3] Once a month, the maternal grandparents received a packet of Father's letters to J.M.S. from DFS. Father also sent cards, including birthday cards, and poems for J.M.S., and pictures for J.M.S. to color. At Christmas, Father sent Christmas presents to J.M.S. and his half-siblings.

Father also wrote letters to Ms. Mitchell and to J.M.S.'s maternal grandparents inquiring about J.M.S. On January 2, 2001, Ms. Mitchell wrote a letter to Father telling him that she had been forwarding his letters to J.M.S.'s maternal grandparents, and that J.M.S.'s maternal grandmother reported that J.M.S. "truly enjoy[ed]" hearing from him and seeing his cards and letters. Ms. Mitchell encouraged Father "to continue corresponding with [J.M.S.] as [Father] [had] over the past 10 months [J.M.S.] has been in custody." Finally, Ms. Mitchell told Father:

> I do not say these things lightly. I admire your constant correspondence with your son. Given the difficult situation you are currently in, contact is difficult at best; however, you have continued to do your best to maintain contact. This contact has meant a great deal to [J.M.S.]—and it is contact the [maternal grandparents] have encouraged and supported.

In addition to corresponding with J.M.S., Father also participated in several programs while in prison. Father took classes for and obtained his G.E.D on January 30, 2001. He also completed a sixteen-hour anger management class, substance abuse and alcohol abuse programs, responsibilities and relationships classes, and two Bible study classes. Some of

---

**3.** Both Ms. Mitchell and Father testified that Father sent two to three letters per week to J.M.S. The evidence in the light most favorable to the trial court's judgment, however, is J.M.S.'s maternal grandmother's testimony that Father wrote to J.M.S. "at least one letter every two weeks."

these programs were completed before the termination petition was filed, while others were completed after the termination petition was filed. Father also worked while in prison, but he did not send any of his $7.50 per month salary to support J.M.S.

On March 22, 2001, the juvenile officer filed a petition to terminate Father's and Mother's parental rights to J.M.S. In the petition, the juvenile officer asserted three grounds for termination. First, the juvenile officer alleged termination was appropriate because, for a period of six months prior to the filing of the petition, Father had, without good cause, left J.M.S. without any provisions for parental support and without making arrangements to visit or communicate with J.M.S.

Second, the juvenile officer alleged that termination was appropriate because, by order dated March 15, 2000, J.M.S. was adjudicated neglected and continued to be neglected in that (1) "[t]he biological mother has continuously failed, although physically or financially able[,] to provide [J.M.S.] with adequate food, clothing, shelter, education or other care and control necessary for his physical, mental, or emotional health and development[;]" and (2) "[t]he biological mother suffers from a chemical dependency which prevents her from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable her to consistently provide such care, custody and control."

As its third and final ground for termination, the juvenile officer alleged that termination was appropriate because J.M.S. had been under the jurisdiction of the juvenile court for over a year, conditions of a potentially harmful nature continued to exist, and there was little likelihood that those conditions will be remedied at an early date so that J.M.S. can be returned to Mother in the near future, and the continuation of the parent-child relationship greatly diminished the child's prospects for early integration into a stable and permanent home. Under this ground, the juvenile officer listed the following specific allegations:

1) [Mother] entered into one Written Service Agreement with [DFS] which she failed to complete.

2) The Juvenile Office and [DFS] have been unsuccessful in their efforts to aid [Mother] on a continuing basis in adjusting her circumstances or conduct to provide a proper home for the child.

The juvenile officer went on to list four other allegations:

3) [Mother] and [Father] have made no monetary payments for the cost of care and maintenance of the child and have shown a disinterest in and lack of commitment toward the child.

4) Additional services would not be likely to bring about a lasting parental adjustment enabling return of the child to [Mother] or [Father] within an ascertainable period of time.

5) The child has no emotional ties to [Father].

6) [Mother] and [Father] have both failed to maintain regular visitation or other contact with the child.

These last four allegations track the language of five of the "best interest" factors listed in § 211.447.6(1)-(5), and not the language in § 211.447.4(3)(a)-(d) concerning conditions the court is to consider and make findings on in determining whether termination is appropriate on the basis of failure to rectify. The "best interest" factors in § 211.447.6 are considered only after the court determines that one or more of the grounds for termination exists. *In re T.A.S.*, 32 S.W.3d 804, 815 (Mo.App. 2000).

Two months after the termination petition was filed, Father was released from prison on June 6, 2001, to the Kansas City Community Release Program, a halfway house. Two days after his release, Father spoke to Ms. Mitchell about the termination petition. According to Ms. Mitchell, Father "was adamant that he did not want his rights terminated." Father told Ms. Mitchell that he wanted to be able to see J.M.S. and to remain in J.M.S.'s life "to some extent," but that he was not asking for custody. Ms. Mitchell told Father that DFS believed it was important that J.M.S. remain with his half-siblings, and Father did not disagree. Father told Ms. Mitchell he just wanted to be able to see J.M.S.

Father also requested that he receive visitation with J.M.S. since he was no longer incarcerated. Ms. Mitchell was advised by the juvenile court that Father was not going to receive any visits, however. Father called J.M.S. at the maternal grandparents' house a couple of times but quit calling after he received a court order advising him that he could not have any communication with J.M.S.

While Father was in the Kansas City Community Release Program, he had approximately $100 left over from his earnings to spend each week. Father sent some toys to J.M.S. in July 2001, and some school supplies to J.M.S. in September 2001. The only monetary support Father sent to J.M.S. between June and September 2001 was a $25 money order. According to Father, in order to avoid incarceration, it was necessary for him to use the rest of his money to pay bond and to pay an attorney to defend him against a speeding ticket and a municipal domestic violence charge, both of which were pending

before he was incarcerated on the narcotics conviction. The domestic violence charge involved his abuse of Mother.

Father remained in the Kansas City Community Release Program until September 29, 2001. At that time, he went to live with his sister and brother-in-law. Father began working at Church's Chicken thirty-five to forty hours a week, making $6.50 per hour. The only monetary support Father sent to J.M.S. during October and November 2001 was a $25 money order. Father sent the $25 money order shortly before the trial on the termination petition.

About a month before the trial, Father had a chance meeting with J.M.S. at The Dollar Store. J.M.S., who was there with his maternal grandparents, clung tightly to his grandfather while Father talked to him for approximately five minutes. After Father left, J.M.S.'s grandmother asked J.M.S. why he acted the way he did. J.M.S. replied, "I just didn't want him messin' with me."

Prior to trial, Mother signed a consent to terminate her parental rights to J.M.S.[4] The trial on the termination petition was held on November 27, 2001. At trial, the juvenile officer presented the testimony of Ms. Mitchell, J.M.S.'s maternal grandmother, and Mother. Father presented his own testimony and that of his sister. Following the trial, the court terminated Father's parental rights to J.M.S. on the grounds of abandonment, under § 211.447.4(1)(b), and abuse and neglect, under § 211.447.4(2).[5] Father filed this appeal.

### Standard of Review

This court will affirm the trial court's judgment terminating Father's pa-

---

4. Mother also signed consents to terminate her parental rights to J.M.S.'s half-siblings.

5. The court also terminated Mother's parental rights to J.M.S. and his half-siblings. Mother does not appeal.

rental rights unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *In re N.M.J.*, 24 S.W.3d 771, 777 (Mo.App.2000). This court views the evidence in the light most favorable to the trial court's judgment and defers to the trial court's determination of the credibility of witnesses. *In re A.R.*, 52 S.W.3d 625, 633 (Mo.App.2001). A reversal or remand is necessary only if this court is left with a firm impression that the judgment is wrong. *In Interest of J.N.C.*, 913 S.W.2d 376, 379 (Mo.App.1996).

■ The juvenile officer bears the burden of proof in a termination of parental rights proceeding. *A.R.*, 52 S.W.3d at 633. The juvenile officer must prove the existence of a statutory ground for termination of parental rights by clear, cogent, and convincing evidence. Section 211.447.5. " 'Clear, cogent and convincing evidence is that which instantly tilts the scales in the affirmative when weighed against opposing evidence.' " *A.R.*, 52 S.W.3d at 633 (quoting *C.B.L. v. K.E.L.*, 937 S.W.2d 734, 737 (Mo.App.1996)).

### Insufficient Evidence of Abandonment

■ In his first point, Father claims that the trial court erred in terminating his parental rights on the basis of abandonment. Section 211.447.4(1) provides that termination is appropriate where the child has been abandoned. Under § 211.447.4(1)(b), a child is determined to have been abandoned "if, for a period of six months or longer … [t]he parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so[.]" Thus, to terminate under § 211.447.4(1)(b), the juvenile officer must prove that the parent, without good cause, both (1) left the child without any provision

for parental support and (2) failed to make arrangements to visit or communicate with the child, although able to do so. *A.R.*, 52 S.W.3d at 633.

■ "Abandonment is defined as the voluntary and intentional relinquishment of custody of a child with the intention that the severance be of a permanent nature or as the intentional withholding by a parent of his care, love, protection and presence without just cause or excuse." *In re R.K.*, 982 S.W.2d 803, 806 (Mo.App.1998). Abandonment has also "been defined as a willful, positive act such as deserting the child; a willful delivery of the child with intention that the severance be permanent; a voluntary and intentional relinquishment of the custody of the child to another with the intent to never again claim the rights of a parent or perform the duties of a parent." *In re Adoption of H.M.C.*, 11 S.W.3d 81, 87 (Mo.App.2000).

■ In determining whether abandonment has occurred, "the parent's intent, an inferred fact, is determined by considering all the evidence of the parent's conduct, both before and after the statutory period." *Id.* To establish the requisite six-month period, however, only the parent's conduct prior to the filing of the termination petition can be considered. *A.R.*, 52 S.W.3d at 636–37. This is so because § 211.447.4(1) grants the juvenile officer the authority to file the termination petition on the basis of abandonment only if, at the time the petition is filed, the parent has abandoned the child for six months or more. *Id.* at 637. "If [the juvenile officer] cannot establish that the parent abandoned the child for six months prior to filing the petition, then [the juvenile officer] had no statutory authority to bring the action in the first place." *Id.*

In its judgment, the court made these findings to support its conclusion that ter-

mination on the basis of abandonment was appropriate in this case:

> The Court finds pursuant to Section 211.447.4(1)(b) RSMo. that [Father] did abandon [J.M.S.] in that for a period in excess of one year prior to the filing of the petition herein [Father] did, without good cause, leave [J.M.S.] without any provision for parental support and without making arrangements to visit with [J.M.S.] prior to his incarceration although able to do so; that the only thing that [Father] has done of any redeeming nature for the benefit of [J.M.S.] was to send him letters while he was incarcerated; that he did not provide, by his own admission, adequate support for [J.M.S.] when he was out of prison; that he moved out of the house and left [Mother] with the three children to raise on her own.

Applying the two-pronged test for abandonment in § 211.447.4(1)(b) to the court's findings, the court's judgment indicates that it determined Father's actions prior to his incarceration satisfied both the first prong, that Father left J.M.S. without any provision for parental support for a period of six months or more, and the second prong, that Father left J.M.S. without making any arrangements to visit or communicate with J.M.S., although able to do so. The court's conclusion is based upon its findings that before he was incarcerated, Father did not support J.M.S. or visit J.M.S. for a period in excess of one year prior to March 22, 2001, and, in fact, moved out of the house leaving Mother to raise J.M.S. and her other two children on her own.

The only evidence of Father living apart from Mother and J.M.S. for any significant time period prior to his incarceration on April 16, 1999, however, was Father's testimony that in March 1998, he moved out of the family home into a duplex and left Mother to pay the bills and care for J.M.S. and his half-siblings for a month. After the one-month separation, the evidence in the record was that Mother, J.M.S., and J.M.S.'s half-siblings moved into Father's duplex.

Father also testified that occasionally during their marriage, Mother would take the children and stay with her parents for a week or so at a time before moving back with him. There was no evidence that Father failed to provide parental support for J.M.S. or failed to visit or communicate with J.M.S. during these occasional week-long separations. Even if this court were to make such an inference, however, these occasional separations, and the month-long separation in March 1998, are insufficient evidence that, prior to his incarceration, Father was separated from Mother and J.M.S. and failed to provide parental support or visit J.M.S. for the requisite six-month statutory period, let alone a period in excess of one year, as the court found.

It is true that during Father's incarceration from April 16, 1999, to June 9, 2001, Father was separated from J.M.S. and failed to provide J.M.S. with financial support. When Father went to prison, however, J.M.S. was in the custody of Mother. The evidence indicates that DFS did not become involved with the family until eight months after Father went to prison, when Mother's deficiencies in caring for the children prompted DFS's involvement.

■ Incarceration, by itself, "shall not be grounds for termination of parental rights." Section 211.447.6(6). Nevertheless, an incarcerated parent's rights may be terminated, as incarceration "does not discharge a parent's statutory obligation to provide his child with a continuing relationship through communication and visitation, and parental rights may be terminated while the parent is incarcerated." *R.K.*, 982 S.W.2d at 806. Likewise, an incarcer-

ated parent's substantially reduced wages "do not excuse his obligation under section 211.447 to make monetary contributions toward support of his child." *Id.* at 807. Although a minimal financial contribution from an incarcerated parent does not significantly aid in supporting the child, it does demonstrate the "parent's intent to continue the parent/child relationship." *Id.*

Even though Father did not send any of his $7.50 per month prison salary in cash to help support J.M.S., the evidence was that throughout his incarceration Father sent at least one letter every two weeks, plus cards, poems, pictures, and Christmas presents, to J.M.S. According to J.M.S.'s maternal grandmother, every month she received a packet from DFS containing Father's letters to J.M.S. Father also sent letters to J.M.S.'s maternal grandparents and to DFS inquiring as to J.M.S.'s well-being.

The trial court stated in its oral findings that Father should have at least sent a quarter in cash to J.M.S. each month as an indication that it was costing him to maintain a relationship with J.M.S. But the undisputed evidence showed that Father spent more than a quarter each month to correspond with J.M.S., and to J.M.S.'s maternal grandparents and DFS about J.M.S. Father's frequent correspondence, and the cost he incurred in maintaining this correspondence, demonstrated his intent to continue the parent/child relationship. Therefore, this court finds that Father's failure to send a portion of his $7.50 per month salary in cash to support J.M.S. is *de minimis* in light of the circumstances of this case and does not support a finding that Father left J.M.S. without parental support for a six-month period while he was incarcerated.

Father's frequent correspondence also demonstrated that, while he was incarcer-

ated, he did not leave J.M.S. without making any arrangements to visit or communicate with the child, although able to do so. It is true that Father voluntarily chose not to have J.M.S. visit him while he was incarcerated. Nevertheless, with regard to Father's decision to refuse visits with J.M.S. while in prison, the trial court stated:

> Let me tell you this for the record: I offer no criticism to him whatsoever for that decision. It was a tough decision for him personally to make, but he will not be criticized for his decision not to ask [that] the child be dragged to the prison to see him.

In addition to determining that Father's decision not to exercise visitation while incarcerated did not weigh against him, the court also acknowledged in the judgment that Father sent letters to J.M.S. while incarcerated. Thus, the evidence does not support a finding that, during Father's incarceration from April 16, 1999, to June 6, 2001, Father, without good cause, left J.M.S. without any provision for parental support and without making any arrangements to visit or communicate with the child for any period of six months or more.

During the five and one-half month period between Father's release from prison on June 6, 2001, and the November 27, 2001, trial on the termination petition, Father had no visits with J.M.S. except for a chance meeting at a store, Father called J.M.S. a couple of times, and Father sent only two $25 money orders, toys, and school supplies to J.M.S. The undisputed evidence was, however, that the court denied Father's request for visits with J.M.S. during this period and entered a no-contact order forbidding Father from communicating with J.M.S. " 'To prove abandonment, there must be evidence which shows accessibility of the child for

the purposes of visitation and communication.'" *A.R.*, 52 S.W.3d at 637 (quoting *In the Interest of G.M.T.*, 965 S.W.2d 200, 203 (Mo.App.1998)).

Moreover, Father's conduct after the filing of the termination petition on March 22, 2001, cannot form the basis for the trial court's finding of abandonment. *Id.* at 636–37. Father's conduct after the filing of the termination petition can be used only to demonstrate whether Father intended to abandon J.M.S. during a six-month period prior to the filing of the petition. This court has already determined, however, that there is insufficient evidence of any six-month period prior to the filing of the termination petition in which Father, without good cause, left J.M.S. without parental support and without arrangements to visit or communicate with him.

The juvenile office failed to meet its burden of presenting clear, cogent, and convincing evidence that Father abandoned J.M.S. by leaving him without parental support and without arrangements to visit or communicate with him for the requisite six-month period. Therefore, the trial court's determination that termination of Father's parental rights was appropriate on the basis of abandonment under § 211.447.4(1)(b) was not supported by substantial evidence and is reversed. Father's first point is granted.

### Abuse and Neglect Not Pleaded to Terminate Father's Rights

▮ In his second point, Father argues that the trial court erred in terminating his parental rights on the basis of abuse and neglect under § 211.447.4(2), because the juvenile officer did not plead this as a ground for termination of Father's parental rights in its petition. Father contends that the court's terminating his parental rights on a basis not alleged in the petition

denied him adequate notice to defend himself and, therefore, denied him his right to due process of law.

▮ "[D]ue process requires that '[t]he petition in a termination of parental rights case should contain allegations likely to inform those persons involved of the charges, to the end that objection may be prepared.'" *In Interest of H.R.R.*, 945 S.W.2d 85, 88 (Mo.App.1997) (citations omitted). Therefore, termination must be based upon a ground alleged in the petition. *Id.*

In its judgment, the court found that, pursuant to § 211.447.4(2), J.M.S. had been neglected. The court stated that Father had continuously failed, throughout J.M.S.'s life, to provide J.M.S. "with adequate food, clothing, shelter or education other care and control necessary for his physical, mental or emotional health· and development although presumably financially and/or physically able to do so[.]" The court then noted specifically that Father had never paid any child support and had never provided any support "whatsoever" for J.M.S. "during the relevant periods of time with the exception of two $25.00 checks in the five months since he's been released from the Department of Corrections." The court found the two $25 checks "to be totally inadequate and not indicative of any indication that he was willing to provide support."

In addition to finding that Father had neglected J.M.S.'s physical needs, the court also found that Father had abused J.M.S. and neglected him emotionally and mentally. Specifically, the court stated:

> The Court finds that [Father] repeatedly physically and emotionally abused [Mother] and [maternal grandmother] in the presence of [J.M.S.] and his siblings; that [J.M.S.] has been abused and neglected emotionally and mentally be-

cause he has been forced to go through what he has been through for the four short years of his life including the beatings of his mother at the hand of his father in [J.M.S.]'s presence, his father leaving his mother and all three children, the arguments between Mom and Dad in the presence of [J.M.S.] and his siblings; and the voluntary acts of [Father] resulting in his incarceration for two years and two months of [J.M.S.]'s four short years of life.

While the petition in this case did assert neglect, it was clearly alleging facts that pertained to terminating only Mother's, and not Father's, parental rights to J.M.S. With regard to neglect, the petition alleged:

b) By order of this Court dated March 15, 2000, the child, [J.M.S.], was adjudicated neglected and continues to be neglected in that:

1) The biological mother has continuously failed, although physically or financially able to provide the child with adequate food, clothing, shelter, education or other care and control necessary for his physical, mental, or emotional health and development.

2) The biological mother suffers from a chemical dependency which prevents her from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable her to consistently provide such care, custody and control.

The petition made no allegation that Father had neglected J.M.S. by continuously failing to provide J.M.S. with adequate food, clothing, shelter, education, or other care and control necessary for his physical, mental or emotional health and development, although physically or financially able to do so. The petition simply made no allegation that Father had neglected J.M.S.

Likewise, the termination petition contained no allegations that Father had abused J.M.S. or emotionally and mentally neglected him by abusing Mother and J.M.S.'s maternal grandmother in J.M.S.'s presence; by leaving Mother, J.M.S., and his half-siblings; by arguing with Mother in J.M.S.'s presence; or by committing voluntary acts that resulted in his incarceration. In fact, the petition contained no allegations of abuse, and the only allegations of any emotional or mental neglect of J.M.S. concerned Mother, not Father.

■■■ The juvenile officer presented evidence of Father's physical abuse toward Mother and J.M.S.'s maternal grandmother and Father's emotional neglect of J.M.S. prior to his incarceration. Father did not object to this evidence as being beyond the scope of the pleadings. When a party does not object to evidence on an issue that is beyond the scope of the pleadings, the pleadings are automatically amended to conform to the evidence and the issue is deemed to be tried by consent. *In re S.L.N.*, 8 S.W.3d 916, 922 (Mo.App. 2000). The implied consent rule, however, " 'applies only where the evidence presented bears solely upon the unpleaded issue and not upon issues already in the case.' " *Id.* (quoting *Edna Enters., Inc. v. Spirco Envtl., Inc.*, 853 S.W.2d 388, 392 (Mo.App. 1993)). Here, evidence of Father's abusive or neglectful behavior was also relevant to whether termination was in J.M.S.'s best interest. Factor (7) of § 211.447.6 provides that when considering whether to terminate parental rights, the court shall consider "[d]eliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm." Because evidence of Father's abusive and neglectful behavior was

also relevant to whether termination was in J.M.S.'s best interest under § 211.447.6(7), an issue already in the case, Father cannot be deemed to have tried by consent the issue of whether termination on the basis of abuse and neglect was appropriate under § 211.447.4(2).[6]

The petition in this case sought termination of Father's rights to J.M.S. on the basis of abandonment, under § 211.447.4(1), and sought termination of Mother's rights to J.M.S. on the bases of abuse and neglect, under § 211.447.4(2), and failure to rectify, under § 211.447.4(3). The petition did not fairly advise Father that he would be required to defend against allegations that he had abused and neglected J.M.S. *See H.R.R.*, 945 S.W.2d at 89. The trial court's judgment terminating Father's parental rights to J.M.S. on the ground of abuse and neglect must be reversed. Father's second point is granted.

The judgment terminating Father's parental rights to J.M.S. is reversed.

All concur.

---

**6.** In *S.L.N.*, the juvenile officer's petition alleged termination on the bases of abandonment and failure to rectify. 8 S.W.3d at 922. The trial court, however, terminated on the bases of neglect and failure to rectify. *Id.* The Southern District of this court held that because evidence regarding neglect was presented without objection, the parent tried by consent the issue of whether termination was appropriate on that ground. *Id.* The basis for the court's holding was its finding that evidence regarding the parent's neglect was "outside the statutory scope" of either the abandonment or the failure to rectify ground. *Id.* The court did not state if it considered whether the neglect evidence was relevant to any of the best interest factors. This court, however, believes such a consideration is necessary to determine whether the parent tried, by consent, termination on a ground not pleaded in the petition.