219 S.W.3d 820 (2007)
In re the Interest of L.N.D.
No. 27910.
Missouri Court of Appeals, Southern District, Division Two.
April 23, 2007.
*822 Margaret Elise Branyan-Barker, Springfield, MO, for Appellant.
William C. Prince, Springfield, MO, for Respondent.
Robert George Asperger II, Springfield, MO, for Juvenile/Minor.
JEFFREY W. BATES, Chief Judge.
G.D., Jr. (Father), appeals from a judgment terminating his parental rights to L.N.D. pursuant to a petition filed by the Deputy Juvenile Officer of Greene County, Missouri.[1] The trial court terminated Father's parental rights pursuant to § 211.447.4(2) (abuse or neglect) and § 211.447.4(3) (failure to rectify).[2] On appeal, Father contends that there was insufficient evidence to support either statutory ground for termination. We affirm.

I. Factual and Procedural Background
When we review a trial court's judgment terminating parental rights, we consider the facts and the reasonable inferences derived therefrom in a light most favorable to the judgment. In re L.R.S., 213 S.W.3d 161, 164 (Mo.App.2007); In re L.M., 212 S.W.3d 177, 180 (Mo.App.2007). Viewed in that light, the following evidence was adduced at trial.
In May 2003, Father was charged with distributing a controlled substance near a school. At some point not disclosed by the record, he was convicted of that charge and placed on five years probation.
L.N.D. was born on August 17, 2003, and resided with K.S. (Mother) in Springfield, Missouri. L.N.D. suffered from apnea and sometimes stopped breathing for as long as 29 seconds while sleeping. Absent timely stimulation or resuscitation, an infant suffering from apnea could suffer brain damage or die due to lack of oxygen. L.N.D. was at an increased risk of death because a previous sibling died of Sudden Infant Death Syndrome. Shortly after birth, L.N.D. began receiving treatment from Dr. Kathleen Rice, an apnea specialist. When L.N.D. was two weeks old, Dr. Rice met with Father "and discussed at length the prolonged apneas and the importance of monitoring and good follow-up."
Thereafter, neither Mother nor Father brought L.N.D. to scheduled appointments with Dr. Rice or the child's general pediatrician. In addition, the apnea monitor was only being used about 60% of the time when L.N.D. slept, which placed her in danger of death or brain damage.[3]
*823 On November 18, 2003, the Children's Division (Division) received a hotline call that L.N.D. was not being taken to the doctor or monitored for apnea. The next day, Division Supervisor Ron Keyes (Keyes) and a Springfield police officer made contact with Mother and L.N.D. The child was taken to the juvenile court office for a conference, which Father attended. While there, he was interviewed by Keyes. Father said he lived in Springfield with his mother and only occasionally had contact with Mother and L.N.D. Father admitted that L.N.D. was supposed to be on an apnea monitor, but he did not know whether the monitor was being utilized. He also knew L.N.D. had doctor's appointments, but "he chose not to" provide any assistance in getting her to those appointments. Finally, Father admitted to smoking marijuana within the past two weeks.
After obtaining copies of L.N.D.'s medical records, Keyes verified that the child had not been on her apnea monitor or attended scheduled medical appointments. The Division tried to work with Mother and Father by offering the services of a Medicaid van to transport L.N.D. to medical appointments, but the parents made statements suggesting they would not use the service. On November 20, 2003, L.N.D. was removed from Mother's home so the child could receive necessary medical care that was not being provided by Mother or Father. That same day, the child was taken into protective custody by the court on grounds of parental neglect.
The adjudicatory hearing was held on January 14, 2004. The court found that the allegations of the petition were true and that L.N.D. was in need of care and protection. On that same date, the court approved a treatment plan for Father. Among other provisions, the plan required Father to: (1) attend parenting classes; (2) attend apnea monitor training; (3) obtain a drug and alcohol assessment, follow all recommendations and undergo random drug tests; (4) not violate the law; (5) maintain a lawful means of steady support; (6) provide support for his child; (7) maintain contact with L.N.D. through regular visitation; and (8) provide and maintain a stable place of residence. Father was supposed to contact the Division once each week concerning his treatment plan, but he only did so once per month.
Father had limited success in complying with his treatment plan. He received apnea monitor training at a local hospital in January 2004, and he attended parenting classes from late July through September 2004. He was not successful in completing any of the other requirements.
Father underwent drug and alcohol assessment in February 2005 and began a treatment program in March 2005. He completed a 28-day inpatient drug treatment program. He also started, but did not complete, a 22-week outpatient drug treatment program. Father missed some scheduled urinalysis tests that were part of his random drug screens, and he had one positive screen for marijuana in January 2005.
Father's positive drug test resulted in the filing of a motion to revoke his probation for failure to comply with the rules of his outpatient substance abuse program and for not completing that program. Father also violated his probation by having guns in his house. These violations of law led to the revocation of his probation on April 1, 2005. He was ordered to serve a 12-year sentence and remained incarcerated at the time of trial. He was not due to be released from prison until March 19, *824 2017.[4] In addition, Father faced a state charge for statutory rape and a federal drug conspiracy charge. Neither charge had been resolved as of the date of trial.
Between November 2003 and April 2005, Father was working for Penmac and a food company. Nevertheless, Father failed to provide L.N.D. with any financial support. In October 2005, the Family Support Division entered an administrative order requiring Father to pay $1.00 per month as child support for L.N.D. Even these nominal payments were not made by Father. His in-kind support was limited to a few gifts of clothing and toys at the beginning of the case. Father provided no in-kind support after August 2004.
Father was scheduled to have one hour of supervised visitation per week. Father and Mother visited L.N.D. two times at the beginning of the case in November or December 2003. In March 2004, the Division scheduled visitation for Father in July 2004, but he canceled because he had to work. In August 2004, the Division tried to arrange visitation, but Father did not follow through with the scheduling process. The next time Father saw L.N.D. was in September 2004. During that month, Father participated in three parent-child interaction sessions with L.N.D. These sessions, which each lasted one hour, were part of the parenting class. Around Christmas 2004, Father came to the visitation with a strong odor of smoke about his body. Father had been told not to do so because L.N.D.'s lungs had been scarred by a bout with pneumonia. Her physicians did not want her to be around anyone who had been smoking because the odor of smoke on a person's clothing could cause L.N.D. to start wheezing. The Division attempted to set up visitation in March 2005, but Father did not follow through with the scheduling process. Once Father was incarcerated in April 2005, he made no requests to the Division to arrange visitation for him with L.N.D. Including the three mandatory parent-child interaction sessions, Father only engaged in visitation with L.N.D. on six of 69 possible occasions. After Father went to prison, he was sent an incarcerated parent letter by the Division in June 2005. The purpose of the letter was to give Father a list of things he could do to help his case while he was in prison, including the following: (1) send cards or letters to L.N.D. two or more times per month; (2) ask the Division for information about L.N.D.'s health and well-being; (3) participate in any child-centered programs available through the prison; and (4) contribute to L.N.D.'s support. Father did none of these things.
Lastly, Father was unable to maintain a stable place of residence. Prior to his incarceration, he provided Division staff with an address where he said he was living with his mother and brother. Father's caseworker believed this residence met minimal health and safety standards, but no home visit was ever completed because Father failed to make his residence available for announced or unannounced visits. The caseworker also was unable to verify who lived at the residence with Father. In any event, Father did not have a suitable residence in which to raise a child after March 2005 because he was incarcerated.
In November 2005, the Greene County Deputy Juvenile Officer filed a petition to terminate Father's parental rights on two statutory grounds: (1) abuse or neglect pursuant to § 211.447.4(2); and (2) failure to rectify pursuant to § 211.447.4(3). The trial on the petition was held in May 2006, and the matter was taken under advisement *825 by the court. The favorable evidence supporting termination has been set out above.
In July 2006, the court entered a judgment terminating Father's parental rights pursuant to § 211.447.4(2) and § 211.447.4(3). After evaluating and making findings on the factors set out in § 211.447.6, the court further found that termination of Father's parental rights was in L.N.D.'s best interest. This appeal followed. Additional facts necessary to the disposition of the case are included below as we address Father's two points of error.

II. Standard of Review
To terminate parental rights, a trial court must use a two-step analysis. In re S.J.H., 124 S.W.3d 63, 66 (Mo.App. 2004). In the first step, the court must find by clear, cogent and convincing evidence that one or more statutory grounds for termination exist. § 211.447.5; In re P.L.O., 131 S.W.3d 782, 788 (Mo. banc 2004). "Clear, cogent, and convincing evidence is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." In re S.M.H., 160 S.W.3d 355, 362 (Mo. banc 2005). This standard of proof may be satisfied even though the court has contrary evidence before it or the evidence might support a different conclusion. In re A.K.F., 164 S.W.3d 149, 151 n. 1 (Mo. App.2005). After finding one or more statutory grounds for termination have been proven, the trial court then moves to the second step and must determine, by a preponderance of the evidence, whether the termination of parental rights is in the child's best interest. § 211.447.5; P.L.O., 131 S.W.3d at 789; S.J.H., 124 S.W.3d at 66.
On appeal, we review a trial court's decision that one or more statutory grounds for termination exist to determine whether the ruling is supported by substantial evidence, is against the weight of the evidence, or involves an erroneous application or declaration of the law. S.M.H., 160 S.W.3d at 362. We will not reverse the trial court's decision unless we are left with the firm belief that the decision was wrong. Id. Conflicting evidence will be reviewed in the light most favorable to the judgment of the trial court. In re A.S.W., 137 S.W.3d 448, 452-53 (Mo. banc 2004). We defer to the trial court's assessment of witness credibility. In re C.F.C., 156 S.W.3d 422, 426 (Mo.App.2005). We use an abuse of discretion standard to review a trial court's decision that termination of parental rights is in the child's best interest. In re B.J.K., 197 S.W.3d 237, 243 (Mo.App.2006).

III. Discussion and Decision
In Point I, Father contends the termination of his parental rights pursuant to § 211.447.4(2) was erroneous because there was insufficient evidence to prove abuse or neglect. Specifically, Father argues the evidence was insufficient to prove that he had an untreatable chemical dependency or that he repeatedly or continuously failed, although physically and financially able, to provide L.N.D. with adequate food, clothing, shelter, education, care or control.[5] Before addressing Father's arguments, a brief review of *826 the relevant statutory framework is helpful.
Section 211.447.4(2) authorizes a court to terminate parental rights if "[t]he child has been abused or neglected." This subsection of the statute also states:
In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:
(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;
(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or
(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development[.]
§ 211.447.4(2)(a)-(d). These four factors are simply categories of evidence to be considered along with other relevant evidence, rather than separate grounds for termination in and of themselves. See In re L.M., 212 S.W.3d 177, 182 (Mo.App. 2007). Nevertheless, proof of one such factor is sufficient to support termination on the statutory abuse or neglect ground. See In re A.S.O., 75 S.W.3d 905, 912-13 (Mo.App.2002); In re N.M.J., 24 S.W.3d 771, 778 (Mo.App.2000).
In the case at bar, the trial court considered and made findings as to all four factors. The court did not rely upon factors (a) and (c) because there was no evidence showing their applicability. Similarly, the court did not rely upon factor (b). While the court noted that Father had used controlled substances, there was no evidence that Father had an "untreatable chemical dependency." With respect to factor (d), however, the court found that Father neglected L.N.D. through the "repeated or continuous failure by [Father], although physically and financially able, to provide [L.N.D.] with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for [L.N.D.'s] physical, mental or emotional health and development." The court based this finding upon the following:
Evidence was presented that established that [Father] failed in [his] duties to provide the child with the appropriate care, custody and control. The child was initially placed into alternative care due to medical neglect in that both the mother and the father, as was previously determined by this court, failed to provide the minor child with the required cardiorespiratory monitor and failed to follow through with recommended follow-up medical treatment for the child such that the child's physical well-being was in jeopardy. Subsequent to the child's placement into alternative care, the father continued to neglect the minor child. The father had been ordered *827 to pay the sum of one dollar per month in child support for the minor and there was no evidence of regular payment of even that small amount. The father did provide minimal items of in-kind support. The father, through his volitional criminal behavior, placed himself in a position where he would be unable for an extended period of time to provide the child with food, clothing, shelter or a consistent parental relationship. The evidence presented established that as of the date of trial, the father was incarcerated in the Missouri Department of Corrections until 2017. The father, while incarcerated, did not take steps to maintain a parental relationship with the minor child. He has not supported her, nor has he attempted to maintain any type of relationship with her. Court finds that even though father was incarcerated he did have the ability to provide at least token support and to make minimal efforts to maintain a relationship with the child. He chose to do neither.
With this review completed, we move to Father's specific arguments.
First, Father argues there was insufficient evidence that he had an untreatable chemical dependency. To support this assertion, Father relies upon his testimony that he successfully completed inpatient and outpatient substance abuse treatment and volunteered for random drug screens.[6] The argument is misdirected because the trial court did not rely upon § 211.447.4(2)(b) as a factor supporting termination of Father's parental rights. Instead, the court relied upon § 211.447.4(2)(d). Proof of this one factor alone is sufficient to support termination. See In re A.S.O., 75 S.W.3d 905, 912-13 (Mo.App.2002); In re N.M.J., 24 S.W.3d 771, 778 (Mo.App.2000). For the reasons set out below, we conclude that there was sufficient evidence to support the trial court's finding as to factor (d). Accordingly, Father's first argument has no merit.
Second, Father argues there was insufficient evidence that he repeatedly or continuously failed to provide L.N.D. with adequate food, clothing, shelter or other care and control necessary for her health and development. To support this assertion, Father relies upon evidence that he provided in-kind items to L.N.D. when he was financially able and maintained stable housing to show his interest in and commitment to L.N.D.
Termination of parental rights based on the factor set out in § 211.447.4(2)(d) requires proof that the parent did not fulfill his or her affirmative duty to support, communicate with and visit the child. See In re S.M.H., 160 S.W.3d 355, 366-67 (Mo. banc 2005). Failure to comply with this affirmative duty shows a parent's lack of commitment to, and interest in, the child. In re Q.M.B., 85 S.W.3d 654, 659-60 (Mo. App.2002). After reviewing the record in the light most favorable to the judgment, we conclude that there was clear, cogent and convincing evidence from which the trial court could have found that Father did fail to support, visit or communicate with L.N.D.
Prior to Father's incarceration in April 2005, he was working. Despite being employed, he failed to provide any financial support for L.N.D. Father's in-kind support was limited to a few gifts of clothing *828 and toys at the beginning of the case and ceased entirely in August 2004. Assuming Father maintained stable housing for a period of time, that ended when his probation was revoked. See In re A.P.S., 90 S.W.3d 232, 235 (Mo.App.2002). It was within the trial court's discretion to give little or no weight to such token gestures of support. In re A.T., 88 S.W.3d 903, 909 (Mo.App.2002); § 211.447.7. Father's visitation with L.N.D. was sporadic. Out of 69 possible visitations, Father only attended six. Three of these occurred during mandatory child-parent interactions sessions that were part of Father's parenting classes. He often went months without visiting his child. Apart from these visitations, Father never communicated with L.N.D. via cards, letters or telephone calls. Moreover, Father made no requests to the Division to keep him apprised of L.N.D.'s health and well-being.
Father's lack of interest in and commitment to L.N.D. was evident before his probation was revoked in April 2005. The continuation of such behavior thereafter was not excused by his imprisonment. Incarceration did not discharge Father's obligation to provide L.N.D. with a continuing relationship through communication and visitation. In re I.Q.S., 200 S.W.3d 599, 604 (Mo.App.2006); In re J.M.S., 83 S.W.3d 76, 83-84 (Mo.App.2002). Similarly, Father was not relieved of his obligation to make a minimal financial contribution for L.N.D.'s support so as to demonstrate an intent to continue the parent-child relationship. In re N.L.M., 101 S.W.3d 376, 381 (Mo.App.2003). "Evidence of this intent is lacking when the parent fails to make any contribution, no matter how diminutive the amount." In re C.M.D., 18 S.W.3d 556, 562-63 (Mo.App. 2000).[7] Termination for neglect must be based on conduct at the time of termination. In re K.W., 167 S.W.3d 206, 211 (Mo.App.2005). In summing up the situation existing as of the time of trial, the court found that "[F]ather, through his volitional criminal behavior, placed himself in a position where he would be unable for an extended period of time to provide the child with food, clothing, shelter or a consistent parental relationship." The record contains ample evidence to support this finding. Point I is denied.
In Point II, Father contends the termination of his parental rights pursuant to § 211.447.4(3) was erroneous because there was insufficient evidence to support this statutory failure to rectify ground. When a trial court finds multiple statutory bases to terminate a parent's rights, we need only determine that one of the statutory grounds was proven in order to affirm the judgment. In re L.A.M.R., 179 S.W.3d 418, 419 (Mo.App.2005). Because the trial court's decision to terminate Father's parental rights pursuant to § 211.447.4(2) on the abuse or neglect ground was supported by the evidence, Point II is moot. Therefore, we will not address Father's claim of error relating to the sufficiency of the evidence to support the failure to rectify ground. See In re L.M., 212 S.W.3d 177, 181 (Mo.App.2007).
The judgment of the trial court is affirmed.
GARRISON and LYNCH, JJ., concur.
NOTES
[1] The parental rights of L.N.D.'s mother had already been terminated with her consent and are not at issue in this appeal.
[2] All references to statutes are to RSMo (2000).
[3] The monitor recorded how frequently it was used. When the monitor company downloaded the device's memory on November 13, 2003, the monitor had only been used on 28 of 49 nights while L.N.D. was sleeping.
[4] Father was not even eligible for conditional release until March 19, 2014.
[5] Father's first point also asserts that the trial court erred in determining that termination of his parental rights was in L.N.D.'s best interest. Because this assertion was not developed in the argument under this point, the issue was abandoned. Roberson v. KMR Constr., LLC, 208 S.W.3d 320, 322 (Mo.App. 2006); Vigil-Keyes v. Vanderwal, 203 S.W.3d 749, 751 (Mo.App.2006). Consequently, we will not review the trial court's determination of the best interest issue.
[6] While Father ignores the dispute in the evidence concerning the extent of his compliance with the chemical dependency provisions of his treatment plan, we cannot do so. Conflicting evidence will be reviewed in the light most favorable to the judgment. In re A.S.W., 137 S.W.3d 448, 452-53 (Mo. banc 2004). So viewed, the record would only support Father's assertion that he successfully completed the inpatient part of his drug treatment program.
[7] In Father's brief, he advances the meritless argument that his failure to provide financial support for L.N.D. should be excused because he was unaware of the $1.00 per month administrative support order. Father had a continuing obligation to support L.N.D. without being ordered to do so. In re S.L.J., 3 S.W.3d 902, 908 (Mo.App.1999); In re T.G., 965 S.W.2d 326, 335 (Mo.App.1998); In re M.B.A., 709 S.W.2d 941, 947 (Mo.App.1986).