In the Interest of M.J.H. and L.M.J., Minors,

M.H., Natural Father, Appellant,

v.

Greene County Juvenile Office, Respondent.

Nos. SD 32353, SD 32354.

Missouri Court of Appeals, Southern District, Division One.

March 28, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 9, 2013.

Application for Transfer Denied May 28, 2013.

---

552

James R. Sharp, of Springfield, MO, for Appellant.

Brittany O'Brien, of Springfield, MO, for Respondent.

WILLIAM W. FRANCIS, JR., J.

M.H. ("Father") appeals the respective judgments terminating his parental rights to his minor children, M.J.H. and L.M.J. ("the Children").[1] Finding no merit in his three points on appeal, we affirm the judgment of the Juvenile Division of the Circuit Court of Greene County (the "trial court").[2]

**Factual and Procedural Background**

"In reviewing a judgment terminating parental rights, this Court consider[s] the facts and reasonable inferences derived therefrom in a light most favorable to the judgment." *In re C.A.M.,* 282 S.W.3d 398, 401 (Mo.App. S.D.2009) (internal quotation and citation omitted). Viewed in that context, the following information is pertinent to this appeal.

The record reveals the Children have been in protective custody since May 3, 2010. M.H. is the natural father of M.J.H., born June 7, 2008, and L.M.J.,

---

1. D.J. ("Mother") was named as the Children's biological mother in the termination of parental rights petitions filed in the trial court below and her parental rights were also terminated as part of those proceedings. As Mother is not a party to this appeal, we make no decision regarding the propriety of the trial court's termination of her parental rights and refer to evidence about Mother only as is necessary to address Father's appeal.

2. The individual cases for each child were consolidated for this appeal. A petition was filed on behalf of each child and a separate judgment was entered with respect to each child.

born May 2, 2010.[3] Tara Becker, an investigator with the Children's Division of the Missouri Department of Social Services, began an investigation regarding the Children after the birth of L.M.J. when Mother tested positive for marijuana, benzodiazepine, cocaine and alcohol at the hospital. A determination was made by Ms. Becker that the Children needed to be in protective custody because of Mother's drug usage, her untreated mental health needs, and Mother's reports that she did not allow the Children to have unsupervised contact with Father due to his alcohol abuse.

On or about May 4, 2010, a "Petition" was filed with the trial court by a Deputy Juvenile Officer ("Juvenile Officer") with the Greene County Juvenile Office ("Juvenile Office"), on behalf of each child, alleging the Children were in "need of the care and treatment of [the] [c]ourt," pursuant to section 211.031.1.[4]

On June 16, 2010, an adjudication hearing was held in which the trial court found that the Children came under the court's jurisdiction, the allegations in the petitions were true, and the Children were in need of the care, protection and services of the court.

Alisa Griffiths ("Griffiths"), a caseworker with Children's Foundation, was assigned as the caseworker for Mother, Father and the Children, when the Children were taken into care. When Griffiths first became involved in the case, she was not provided any information as to the Children's father other than his name. Father was then located and on May 4, 2010, he was made aware the Children had been taken into protective custody. He was later served with the petitions filed by the Juvenile Officer.

When Griffiths began working on the case, Father was not incarcerated. He became incarcerated approximately two weeks after the children came into care. The only opportunity Griffiths had to visit with Father before he was incarcerated was at the 72-hour meeting. Griffiths was unable to set up visits between Father and the Children because he remained incarcerated for the remainder of the case up to and through the time of trial.

On June 9, 2010, Griffiths prepared an "Incarcerated Parent Treatment Plan" for Father, which was approved by the trial court on June 16, 2010. The treatment plan was structured to work toward the goal of reunification as evidenced by "Goal 1" of the treatment plan which stated: "[Father] will maintain an ongoing relationship with [the] [C]hildren[.]"

On June 21, 2011, more than a year after the Children came into care, a "PETITION TO TERMINATE PARENTAL RIGHTS" was filed with the trial court, for each child. The trial, as to both Children, was held on August 14, 2012. Griffiths and Father were the only witnesses to testify.

At the outset of the hearing, the trial court took judicial notice of the abuse and neglect and termination files, along with several criminal cases involving father, including the conviction for which Father was in custody. The trial court also re-

---

3. We initially note that the trial transcript indicates the Juvenile Officer offered fifteen exhibits which were all admitted into evidence. As to any exhibits which were not filed with this Court as provided in Rule 81.16, we take the intendment and content of the exhibit as favorable to the trial court's ruling and as unfavorable to Father. See *In re Marriage of Gourley*, 811 S.W.2d 13, 16 (Mo.App. S.D.1991) (citing *Doyle v. Doyle*, 786 S.W.2d 620, 621 (Mo.App. S.D.1990)).

4. All references to statutes are to RSMo 2000, unless otherwise indicated.

ceived in evidence the paternity tests showing that Father was the biological father of the Children.

In addition to the testimony outlined above, Griffith also testified as to Father's tasks under the treatment plan. Griffiths testified Father kept in regular contact with her sending letters every couple of months; had phone calls with M.J.H., which were frequent; and sent letters every eight weeks or so and pictures to the Children. She testified that other than the cards and pictures sent by Father, neither Father, nor his family, had provided any gifts for the Children. Father also had not provided any financial support for the Children. Griffiths testified she was unable to refer services to Father due to his incarceration, but Father was able to participate in some programs once he was transferred to the Department of Corrections ("DOC").

Griffiths testified that early in the case, Father gave her his mother's name ("J.H."), and requested that an "ICPC"[5] home study be done so that placement with J.H. could be considered for the Children. J.H. resided in Memphis, Tennessee, and had never met either of the Children. The ICPC was completed and approved. The family support team felt it was important for J.H. to come to Springfield and meet the Children, as well as meet with L.M.J.'s doctors in light of his special needs[6] to make sure J.H. felt she could care for L.M.J. However, J.H. was unable to travel to Springfield due to financial reasons. J.H. neither came to visit the Children, nor provided any cards, letters or pictures to the Children.[7] The decision was made not to place the Children with J.H. because J.H. made no effort to contact the Children or meet with L.M.J.'s doctors regarding his necessary care and treatment.

Griffiths testified the Children did not reside together. L.M.J. was placed in a home that was able to meet his medical needs, and M.J.H. was residing with his maternal great-grandmother and two half siblings. Despite being in separate placements, M.J.H. and L.M.J. continued to have contact with each other throughout the case. Griffiths testified there was a bond between M.J.H. and his two siblings, and it would be in his best interest to remain in a placement with them. Griffiths testified she saw both the Children every two weeks and neither one ever brought up the subject of Father during those visits.

Griffiths did not feel there were any additional services that could be provided to Father to enable reunification between him and the Children, and it was her recommendation that parental rights be terminated, the Children continue in their current placements, and they be eligible for adoption.

Father testified on his own behalf. Father testified that at least a year and a half

5. Although not found in the record before us, this Court believes "ICPC" is the abbreviation for the "Interstate Compact on the Placement of Children."

6. L.M.J. was a premature baby who was drug exposed, resulting in a number of medical issues requiring numerous medical professionals and appointments. L.M.J. requires hands-on intensive care and has many different medical appointments, including physical therapy. In addition, Respondent's brief states L.M.J. has "special medical needs, including cerebral palsy"; however, we do not find testimony or documents indicating L.M.J. has cerebral palsy in the record before us.

7. At the time of trial, Father had not had his family send money or "things" to the Children. He testified he recently contacted his mother regarding sending toys to the Children and believed she was sending a package that day.

prior to his incarceration and prior to the Children coming into care, M.J.H. was living with his maternal great-grandmother. Although M.J.H. was not living with him, Father testified he "car[ed]" for M.J.H. by visiting him every day. Father testified that at the time the Children came into care, he was out on bond waiting disposition of a charge for manufacturing a controlled substance in Greene County. Approximately two weeks after the Children came into care, Father committed and was charged with robbery in Newton County. Father was ultimately convicted of the charge related to the robbery and was sentenced to 12 years in the DOC.[8] Father then entered an *Alford*[9] plea in Greene County on the charge of manufacturing a controlled substance and was sentenced to 8 years, to run concurrent with the 12–year sentence. At the time of trial, Father was serving the concurrent sentences of 8 and 12 years on the convictions from Greene and Newton County, with two years' credit for time served. Father had appealed the Newton County conviction.

As to his release date, Father testified his understanding was that as a part of his *Alford* plea, he was to serve only 30 percent of his 8–year sentence and since he had been credited two years for time served, he believed he had met the requirements of that sentence and then, if his "appeal is reversed for the 12 years,"

he would "have immediate release." The DOC records indicated Father's earliest release date was May 21, 2018. Father testified he was "pretty sure [he would] be out before then." Father testified that he expected to come before the parole board in November 2013, but he had "heard of occasions when the Parole Board push[ed] up your date if [you were] not in any trouble" and he had "zero percent."

At the time of trial, Father's appeal on the Newton County conviction was still pending and he expected to "hear something by the end of the year."[10] Also pending at the time of trial, was a federal lawsuit Father filed alleging civil rights violations and his treatment while in the Newton County Jail.

Father testified he had been participating in multiple programs while incarcerated, including studying for his "GED" and attending Alcoholics Anonymous and Narcotics Anonymous meetings. Father testified he frequently talked to M.J.H. on the phone,[11] sent cards and pictures he had drawn to the Children, and had sent some movies to M.J.H.

Father was not ordered to pay child support. Father received $7.50 a month from the DOC, but only received $6.00 because $1.50 was paid towards the filing fee on a lawsuit he had pending in federal

---

8. Father testified that he was originally charged with first degree robbery and was acquitted, then the State refiled for second degree robbery and he was convicted of that charge. We note the trial court took judicial notice of various criminal files involving Father, however, those files were not included in the record filed with this Court.

9. An *Alford* plea allows a defendant to plead guilty to the charged crime and accept criminal penalty even if he is unwilling or unable to admit he committed the acts constituting the crime. *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

10. Father's conviction and sentence in the Newton County case were affirmed on direct appeal by this Court in an unpublished order and memorandum filed on November 20, 2012.

11. Griffiths testified Father did not go through her for the phone calls, rather he called the foster family direct. She had not heard of any problems with the phone calls other than "he calls numerous times during the day."

court alleging civil rights violations against the Newton County Jail. Father had not paid any of the remaining $6.00 per month towards child support for the Children. He had not provided any financial support for the Children, nor had he asked his family to do so. At the time of trial, Father admitted his inability to provide and care for the Children, and stated that if for some reason he was not released for several more years, he wanted the Children to be placed with family members. Father stated he was happy with the placement of M.J.H., but would like for L.M.J. to be placed in the same home as M.J.H. and his two half siblings.

Upon his release, Father testified he intended to move to Springfield and participate in a re-entry program through the DOC for housing, transportation, and employment. Father also planned to use the anticipated proceeds from his pending federal lawsuit to financially provide for the Children once released from the DOC, as he was expecting to be "heavily compensated."

Chris Hazelrigg, the guardian ad litem for the Children, recommended that Father's rights be terminated so that the Children could have permanency with their siblings.

On August 23, 2012, the trial court terminated Father's parental rights. The trial court found that the Juvenile Office had proved both neglect, pursuant to section 211.447.5(2), and failure to rectify, pursuant to 211.447.5(3). Additionally, the trial court concluded it would be in the best interest of the Children to terminate Fa-

ther's parental rights. Father filed his notices of appeal on November 5, 2012.

In three points relied on, Father contends the trial court erred in finding: (1) Father abused or neglected the Children; (2) the Children had been under the jurisdiction of the court for more than one year and Father failed to rectify the conditions that led the Children coming into care; and (3) termination was in the Children's best interest. The Juvenile Office contends the evidence established grounds for termination and it was in the Children's best interest.[12] The issues presented for our determination are:

1. Was there clear, cogent and convincing evidence to demonstrate one or more grounds for termination of parental rights as set forth in section 211.447.5?

2. Did the trial court abuse its discretion in finding termination of Father's parental rights was in the best interest of the Children?

### Standard of Review

■ "A trial court's decision to terminate parental rights is reviewed under the well-known standards of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976)." *In the Interest of C.L.W.*, 115 S.W.3d 354, 355 (Mo.App. S.D.2003). We will affirm the trial court's judgment terminating parental rights "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law." *Id.* "We will not reverse the trial court's decision unless we are left with the firm belief that the decision was wrong." *In re*

---

12. The Juvenile Office contends in its Point I that Father's appeal should be denied because it was filed out of time and counsel for the Juvenile Office was not provided the statutorily required notice. Father was granted ten days from October 30, 2012, to file his notice of appeal, and he complied by filing his notice of appeal on November 5, 2012. The "Special Order" allowing the late filing of a notice of appeal was served on counsel for the Juvenile Office, as was the notice of appeal. We deny Juvenile Office's request for dismissal.

*S.M.B., Jr.*, 254 S.W.3d 214, 218 (Mo.App. S.D.2008).

In order to terminate parental rights, the trial court must employ a two-step analysis. *In the Interest of S.J.H. and C.A.H.*, 124 S.W.3d 63, 66 (Mo.App. W.D.2004). First, the court must determine whether a statutory ground for termination has been proven by "clear, cogent, and convincing evidence." *Id.;* § 211.447.5. "Clear, cogent and convincing evidence is that which 'instantly tilts the scales' in favor of termination when weighed against the evidence presented by the parent whose rights were terminated." *In re A.M.F. and D.R.F.*, 140 S.W.3d 201, 205 (Mo.App. S.D.2004) (quoting *In the Interest of C.L.W.*, 115 S.W.3d at 355–56). Clear, cogent and convincing evidence may be found even though the court has contrary evidence before it or the evidence may support a different conclusion. *In re S.M.B., Jr.*, 254 S.W.3d at 218.

If the first step is satisfied, the trial court proceeds to the second step and determines whether termination of parental rights is in the best interest of the child. *In the Interest of L.M.*, 212 S.W.3d 177, 181 (Mo.App. S.D.2007). An appellate court reviews a best-interest ruling per an abuse-of-discretion standard. *In re P.L.O.*, 131 S.W.3d 782, 789 (Mo. banc 2004). The trial court's discretion is abused "when it is so 'clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" *In the Interest of D.M.B.*, 178 S.W.3d 683, 690 (Mo.App. S.D.2005) (quoting *In re E.D.M.*, 126 S.W.3d 488, 497 (Mo.App. W.D.2004)).

"In our review, we are mindful that the juvenile court was in a superior position to judge the credibility of the witnesses and that it was free to believe all, part, or none of the witnesses' testimony." *In re B.C.K.*, 103 S.W.3d 319, 322 (Mo.App. S.D.2003). Any conflicting evidence is viewed in the light most favorable to the trial court's decision. *In re C.A.M.*, 282 S.W.3d at 405.

## Analysis

### *Grounds for Termination of Parental Rights*

Father claims the trial court's finding was not based on substantial evidence that he abused or neglected the Children, pursuant to section 211.447.5(2), or failed to rectify, pursuant to section 211.447.5(3), as grounds for terminating his parental rights. We need only find one of these statutory bases was sufficiently proven to sustain the judgment. *In Interest of C.L.W.*, 115 S.W.3d at 356. Because we find there is sufficient evidence for finding that Father neglected the Children, we need only address Father's allegations of error based on this ground. *Id.*

In Point I, Father claims the trial court's finding that Father abused or neglected the Children was not based on substantial evidence because the evidence at trial was that

Father, while incarcerated, could be out as early as November 2013, unless his conviction is overturned on appeal, in which case his release could be much sooner than that; there was no evidence that Father had the ability to provide any meaningful support to the [C]hildren since he was incarcerated; that the legislature has indicated that incarceration, by itself, is not a ground for termination of parental rights; and the trial court itself found that Father was a man who cares about the welfare of his children.

We disagree.[13] At the outset, we note that it is well settled, and we agree, that "[i]ncarceration in and of itself is not grounds for termination of parental rights." *In re N.L.M.*, 101 S.W.3d 376, 381 (Mo.App. S.D. 2003). "Nevertheless, an incarcerated parent's rights may be terminated ... while the parent is incarcerated." *In re J.M.S.*, 83 S.W.3d 76, 83 (Mo.App. W.D. 2002) (internal quotation and citation omitted). While we acknowledge that incarceration may limit a parent's ability to maintain contact and support his or her child, incarceration of a parent does not preclude a finding of neglect as grounds for termination of parental rights.

 Section 211.447.5(2) authorizes a trial court to terminate parental rights if "[t]he child has been abused or neglected." A trial court is directed to consider and make the following findings in determining whether to terminate parental rights on this statutory ground:

(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;

(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should

have known that such acts were being committed toward the child or any child in the family; or

(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development.

§ 211.447.5(2)(a)-(d). "These four factors are simply categories of evidence to be considered along with other relevant evidence, rather than separate grounds for termination in and of themselves." *In re S.M.B., Jr.*, 254 S.W.3d at 220. "Nevertheless, proof of one such factor is sufficient to support termination on the statutory abuse or neglect ground." *Id.*

Here, the trial court considered and made findings as to all four factors relevant to the ground of statutory neglect. The trial court did not rely on factors (a), (b), or (c) as to Father because there was no evidence showing those factors applied. However, as to factor (d), the trial court found with respect to Father and both the Children that

[F]ather knowing he was the father of [the Children] chose to engage in conduct which resulted in his incarceration for the past two years and a conviction with a twelve[-]year sentence.... [Father] has no way of providing for [the Children]'s food, clothing, shelter or medical care at the present time or for the remainder of his incarceration and although he is optimistic that his release will be in the next couple of years that has not been assured. [Father]'s primary plan for how he would support [the

---

**13.** Because we find no error in the trial court's finding on neglect, we do not address Father's claims of error in his second point.

Children] if and when he was released from prison is to use the money he hopes to receive in a federal lawsuit he has filed. At this time[,] there is no way to determine when that lawsuit will be resolved, if [Father] will prevail, and even if he were to prevail; how much money he would receive.

The Court listened to the testimony of [Father] and found him to be a man that cares about the welfare of [the Children], but also a man that does not have a realistic understanding of the care required to care for two young children, the facts of his own criminal case or the affect his incarceration has on [the Children].

In addition, the trial court found specifically with respect to Father and M.J.H. that

[F]ather's own testimony was that prior to his incarceration he did not provide for [M.J.H.J's] care as [M.J.H.] resided with [his] maternal [great] grandmother and that since [Father] has been incarcerated he has written letters, but provided no financial or in[-]kind support to [M.J.H.]. In addition, there was evidence presented that [Father's] extended family has not provided any meaningful support for [M.J.H.] in his stead.

Lastly, the trial court found specifically with respect to Father and L.M.J. that

[t]he evidence presented was that [L.M.J.] was born premature and had extensive medical needs due to [M]other's drug use during the pregnancy. Neither [Father] nor his extended family has made any attempts [sic] provided any aid or support for [L.M.J.] and his medical needs.

 "Courts define neglect as the failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being." *In the Interest of C.L.W.*, 115 S.W.3d at 358. Neglect sufficient to support termination must "be based on conduct at the time of termination, not just at the time jurisdiction was initially taken." *In re K.A.W.*, 133 S.W.3d 1, 10 (Mo. banc 2004).

 Here, the evidence supports the conclusion that Father neglected the Children. Father's lack of commitment to the Children was evident before and after his incarceration. Father has been absent for all of L.M.J.'s young life, and most of M.J.H.'s life. At least one and a half years prior to his incarceration, Father failed to provide financial or in-kind support to M.J.H. M.J.H. was not living with Father prior to coming into care, rather, he was living with and being cared for by his maternal great-grandmother. Father testified he "car[ed]" for M.J.H. by visiting him every day, and that he was not ordered to pay child support. However, this does not relieve Father of his duty to support his child. The financial support of a minor child is a "continuing parental obligation[,]" and a parent has a duty to contribute as much as he or she can. *In re Q.M.B.*, 85 S.W.3d 654, 660 (Mo.App. W.D.2002). A parent is obligated to provide support even in the absence of a demand for payment. *In re K.T.K. v. Crawford County Juvenile Office*, 229 S.W.3d 196, 202–03 (Mo.App. S.D.2007). Father did not present any evidence that he was unable to financially support the Children prior to his incarceration and, therefore, it was permissible for the trial court to conclude he was financially able to do so. *See In re A.H.*, 9 S.W.3d 56, 60 (Mo.App. W.D.2000). There was no evidence that Father cared for M.J.H., provided financial support, or provided in-kind support prior to Father's incarceration. In fact, the evidence was quite the opposite: Father failed to provide any financial

support for either of the Children at any point during their lives.

 Father's failure to provide for both Children continued once incarcerated. Since his incarceration, he had written letters, but had provided no financial or in-kind support to the Children. Father currently receives $7.50 a month from the DOC, but does not pay any of that towards child support for the Children. Father may not rely upon his incarceration as a reason for failing to contribute any money toward the Children's support because incarceration does not discharge Father's obligations to the Children. *See In re L.N.D.*, 219 S.W.3d 820, 828 (Mo.App. S.D. 2007) (parents' incarceration does not relieve them from their obligation to make a minimal financial contribution for child's support). We acknowledge that an incarcerated parent's contribution "will not significantly assist in providing the parent's child with essentials," but instead, it shows the parent's intent to continue the parent-child relationship. *In re M.L.K.*, 804 S.W.2d 398, 402 (Mo.App. W.D.1991). Evidence of this intent is lacking when the parent fails to make any contribution, no matter how small the amount. *Id.* Father had not used any of the $7.50 he received to make any financial contribution for the Children,[14] although $1.50 was paid towards the filing fee on his federal lawsuit, nor had Father's family stepped in to provide support for the Children in his place. The ICPC home study for J.H. was approved for placement, yet she never came to visit the Children, nor provided any support, cards, letters or pictures to the Children.

 There was also evidence that even after the Children came into care, a fact of which Father was aware, he continued in criminal activity. When the Children came into care, Father was out on bond awaiting disposition of a criminal charge. He was aware the Children were in care and even attended a 72–hour meeting regarding the Children, yet he committed a new crime approximately two weeks after the 72–hour meeting. Father was ultimately convicted on a charge related to the new crime in Newton County and sentenced to 12 years in the DOC. Father should have realized that committing additional crimes after the Children came into care would have harmful consequences to the Children. *See In re H.N.S.*, 342 S.W.3d 344, 351 (Mo.App. S.D.2011). The trial court found Father did not realize the affect his actions and incarceration had on the Children. Father's actions placed him in the position of being unable, for an extended period of time, to provide the Children with food, clothing, shelter, education, or a consistent parental relationship. *See In re L.N.D.*, 219 S.W.3d at 828.

Termination for neglect must be based on conduct at the time of termination. *In re K.W.*, 167 S.W.3d 206, 211 (Mo.App. E.D.2005). In summing up the situation existing at the time of trial, the trial court found that "[F]ather knowing he was the father of [the Children] chose to engage in conduct which resulted in his incarceration for the past two years and a conviction with a twelve[-]year sentence." The trial court further found that Father is "a man that does not have a realistic understanding of the care required to care for two young children, the facts of his own criminal case or the affect his incarceration has on [the C]hildren." Finally, the trial court found father had no way of providing for the Children now or for the remainder of his incarceration.

---

14. The trial court did recognize that Father had written letters since his incarceration, but in the same sentence noted he provided no financial or in-kind support.

We also look at the Father's ability to care for the Children to determine whether Father failed to provide for the care, custody and control of the Children. Father testified he did not have a way to provide for the Children for the remainder of his incarceration. L.M.J. has a number of medical issues and special needs requiring more attention, numerous medical appointments, hands-on care, and physical therapy. At the time of trial, L.M.J.'s foster family had additional training to care for his needs. From the review of Father's testimony, it did not appear that Father was aware of the extent of training required to care for L.M.J.

While Father's primary plan for support once released was money he anticipated receiving from a federal lawsuit, there is no way to know if and when that lawsuit will be resolved, if he will prevail, or even how much money he would receive if successful. Also, Father's contention that he could be released soon is not a guarantee because his early release is dependent upon events that may not take place, and if they do, may be in the distant future. His testimony regarding early release is speculative at best, as evidenced by this Court's unpublished order and memorandum filed on November 20, 2012, affirming his conviction and sentence in the Newton County case.

After a thorough review of the record, we find the trial court's finding that clear, cogent, and convincing evidence supported the termination of Father's parental rights based on neglect is sufficiently supported by the record. Accordingly, we conclude the record demonstrated one or more grounds for termination of parental rights existed as required in section 211.447.5. Father's Point I is denied, and Point II is moot as previously stated.

### Best–Interest Determination

Next, Father contends the trial court erred in finding it was in the Children's best interest to terminate his parental rights because Father could be out of prison as early as November 2013, the trial court found Father cared about the welfare of the Children, there was no evidence that Father was capable of providing meaningful support to the Children while incarcerated, Father regularly attempted to communicate with the children, M.J.H. is bonded to Father, and termination of parental rights would permanently sever any contact between the Children and Father's family. The Juvenile Office contends there was no abuse of discretion because Father had demonstrated a lack of commitment to the Children, additional services were unlikely to bring about lasting parental adjustment, and Father's felony conviction was of such a nature to deprive the Children of a stable home for years. Here, we consider whether the totality of the circumstances show it was in the Children's best interest to terminate Father's parental rights.

As previously noted, after determining one or more statutory grounds for termination have been proven, the trial court must make a best-interest determination. Section 211.447.7 sets forth seven factors for the court to evaluate and consider in deciding whether termination of the parent-child relationship is in the child's best interest.[15] Determining a

15. Those factors are:
 (1) The emotional ties to the birth parent;
 (2) The extent to which the parent has maintained regular visitation or other contact with the child;

 (3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody

child's best interest is a subjective assessment based on the totality of the circumstances. *In the Interest of C.A.M.*, 282 S.W.3d at 409. There is no requirement that all seven of these factors must be negated, nor is there a minimum number of negative factors required before a court may terminate parental rights. *Id.*

 Here, the trial court considered each factor under section 211.447.7. After careful review, we conclude the trial court's "best interest" findings are supported by the record, and limit our discussion to the findings of which Father now complains.[16] First, Father argues the trial court's findings failed to take into consideration the evidence that "father could be released as early as November 2013." When questioned, Father did not argue that the DOC records indicated his earliest release date was May 21, 2018. Father's only evidence of a potential earlier release date was testimony that he was "pretty sure [he would] be out before then"; his appeal of the Newton County conviction; and/or a decision from the parole board in November 2013, or earlier, because he "heard of occasions when the Parole Board push[ed] up your date if [you were] not in any trouble" and he had "zero percent." We now know reversal of his conviction will not provide Father an earlier release date because his conviction was affirmed. At the time of trial, Father's parole date of November 2013, was 15 months away. Even still, his release on that date was not guaranteed, nor was an earlier parole hearing date. Any evidence Father presented of a November 2013 release date is speculative at best, and not based on any facts before the trial court. The trial court was in a superior position to judge the credibility of the witnesses and evidence, and we defer to the trial court's assessment. *See In re C.A.M.*, 282 S.W.3d at 405.

 Father also points out the trial court found that he was a man who cared about the welfare of the Children. The trial court noted this as part of the court's finding that Father neglected the Children. Father confuses this finding as evidence contrary to the trial court's finding that Father's behaviors indicate a lack of commitment to the Children.

 Father argues he is committed to the Children as evidenced by the fact he sent cards to the Children and maintained contact with the caseworker. While Father did send some letters since his incarceration, the trial court found this did not erase the lack of commitment demonstrated by Father's volitional criminal activity that resulted in his incarceration for several years. It was permissible for the trial court to consider Father's volitional crimi-

of the division or other child-placing agency;

(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;

(5) The parent's disinterest in or lack of commitment to the child;

(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;

(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm. Section 211.447.7(1)-(7)

16. Father does not point this Court to the specific statutorily required findings under section 211.447.7 he contests. However, after review of his complaints and the judgments, it appears Father's complaints are with the trial court's findings as to sections (1), (3), (5), and (6).

nal behavior that prevented the Children from receiving appropriate support and parenting from Father. *See In re A.P.S.,* 90 S.W.3d 232, 235 (Mo.App. S.D.2002). In addition, Father's inconsistent record supporting M.J.H. when he was not incarcerated is significant. Thus, even when considering the letters Father sent to the Children, the trial court did not abuse its discretion in finding it was in the best interest of the Children to terminate Father's parental rights.

 Father further argues there was no evidence he was capable of providing meaningful support to the Children while he was incarcerated because he earned only $7.50 a month. As stated above, Father may not rely upon his incarceration as a reason for failing to contribute any money toward the Children's support. *See In re L.N.D.,* 219 S.W.3d at 828. Father mischaracterizes the support expected from an incarcerated parent because the minimal wages received by an incarcerated parent do not excuse their obligation to provide support to their children. Incarceration does not excuse a parent's obligation to provide the child with a continuing relationship or to make monetary contributions toward the child's support. *In re J.M.S.,* 83 S.W.3d at 83. The law is clear that an incarcerated parent is not expected to make a "meaningful contribution" to a child's support as alleged by Father. *In re M.L.K.,* 804 S.W.2d at 402. Instead, Father is expected to make a contribution evidencing his intent to continue the relationship. *Id.* Father had the opportunity to evidence his intent to continue his relationship with the Children by providing a minimal contribution from the money he received, but he chose not to do so. *Id.* Father did not provide financial or in-kind support to the Children while incarcerated, much less prior to his incarceration.

 The statutorily required " 'best-interest' " findings serve as an aid to the trial court in deciding best interest, but are not the only considerations. *In re L.M.,* 212 S.W.3d 177, 186–87 (Mo.App. S.D.2007). The trial court's best-interest finding is based on the totality of the evidence before the court. *Id.* at 187. Here, there was overwhelming evidence before the trial court that it was in the Children's best interest to terminate Father's parental rights: (1) While Father has maintained contact with M.J.H. through phone calls and letters, he has not seen him; (2) Father has never met L.M.J.; (3) Father has not financially supported the Children or provided any in-kind support; (4) no additional services can be offered to Father while incarcerated; (5) Father demonstrated a lack of commitment to the Children by his volitional criminal activity after the Children came into care; and (6) Father is serving a 12–year sentence and an 8–year sentence, to run concurrently, which will deprive the Children of a stable home for a period of years.

In viewing the totality of the circumstances, there is a sufficient record for the trial court to conclude, by a preponderance of the evidence, that it was in the Children's best interest to terminate Father's parental rights. Accordingly, the judgments of the trial court are affirmed.

GARY W. LYNCH, P.J., and NANCY STEFFEN RAHMEYER, J., concur.